## FRANK P. FRUMENTO v. MARY MEZZANOTTE ET AL. (10827)

HEALEY, PARSKEY, SHEA, GRILLO and MENT, Js.

Argued December 9, 1983—decision released April 10, 1984

*Brian T. Fischer,* with whom, on the brief, was *James E. Fischer,* for the appellant (plaintiff).

*R. William Bohonnon,* with whom, on the brief, were *Kenneth W. Bohonnon* and *David M. Bohonnon,* for the appellee in the main action and appellant on the third party complaint (defendant and third party plaintiff Louis D'Onofrio, Jr., administrator [estate of Louis D'Onofrio]).

*Jonathan J. Einhorn,* with whom, on the brief, was *Stuart A. Margolis,* for the appellee in the main action and on the third party complaint (named defendant and third party defendant).

ARTHUR H. HEALEY, J. The plaintiff, Frank Frumento, brought this action seeking specific performance of a contract entered into with the defendants, Mary Mezzanotte and Louis D'Onofrio, Jr., administrator d.b.n. of the estate of Louis D'Onofrio, co-owners of certain real property located in West Haven. The trial court refused to decree specific performance and this appeal followed.

The pertinent facts found by the trial court are as follows: The realty in question was purchased in 1948 by David Mezzanotte, the now-deceased husband of the defendant Mary Mezzanotte, and Louis D'Onofrio, the now-deceased father of the defendant D'Onofrio. Following the deaths of David Mezzanotte and Louis D'Onofrio in 1959 and 1960, respectively, their widows succeeded to their ownership of the realty and at that time unpaid taxes began to accrue on the property.

In 1976, Mezzanotte determined through inquiry at the West Haven tax office that there was a large amount of unpaid taxes on the property. At that time, Mezzanotte offered to pay her share of the taxes if the D'Onofrios would do likewise, but the D'Onofrios would not pay their share. The D'Onofrio widow died in 1977 and Mezzanotte repeated her offer to pay her share of the taxes, but the defendant D'Onofrio refused to pay the share of the D'Onofrio estate.

Thereafter, Attorney William Bohonnon, the defendant D'Onofrio's attorney, approached Mezzanotte regarding the sale of the property. Mezzanotte told Bohonnon that she was not interested in selling. Mezzanotte then retained Attorney Frederick

Greenberg and met with him in the spring of 1978. At that time, she related her concern over the taxes on the property and her desire to settle the matter. There was no discussion during this meeting about selling the property.

Approximately one year later, Bohonnon advised a former law associate of Mezzanotte's brother-in-law that substantial back taxes were due on the property in question. This attorney communicated this to Mezzanotte who then confirmed it with the West Haven tax office and the corporation counsel's office. Shortly thereafter, Mezzanotte received a telephone call from Greenberg who informed her that he had received an offer to purchase the property and he requested that she meet with him in his office to discuss the matter. This meeting, the second of three which Mezzanotte had with Greenberg, took place in the latter part of July, 1979. Mezzanotte was informed by Greenberg during this meeting that an offer of $35,000 had been made for the property and that he had engaged Robert Parente, an appraiser, who believed this to be a good offer.[1] Mezzanotte responded that, although she did not know what price to put on the property, she felt that $35,000 was not the right amount and that it was too low. Mezzanotte then left Greenberg's office.

In the latter part of August, 1979, Mezzanotte received another telephone call from Greenberg in which he requested that she come to his office to sign a sales agreement for the property. Greenberg told Mezzanotte over the telephone that he could see no point in not selling, that she was going to lose the prop-

---

[1] The trial court found that Robert Parente was contacted by D'Onofrio in 1978 with regard to having the property "surveyed" prior to D'Onofrio's petitioning for a subdivision of the property into building lots. Parente's work at that time was directed toward that subdivision effort and to that end he worked together with D'Onofrio and his attorney, William Bohonnon. Parente's actual appraisal of the property as a four-lot subdivision post-dated this second meeting between Mezzanotte and Greenberg.

erty anyway. Mezzanotte responded that she could not meet with Greenberg until her daughter, who was then visiting in San Francisco, was able to accompany her to Greenberg's office since she did not go out alone.[2] Thereafter, on or about August 21 or 22, 1979, Mezzanotte and her daughter met with Greenberg in his office. During this third meeting, Greenberg again told Mezzanotte that if she did not sell the property she would lose it through foreclosure. At this meeting, Mezzanotte signed the agreement[3] for the sale of the property. It is this agreement for which the plaintiff seeks specific performance.[4] At the time when she signed the agreement, it provided for a closing date of August 15, 1979.[5] This date was subsequently crossed out and the date August 31, 1979, was sub-

---

[2] The trial court found that the defendant Mezzanotte, who was seventy-two years old, had suffered a stroke several years ago, "which has slowed her down" and that she was accompanied by her daughter whenever she went out.

[3] The agreement identified the sellers as "Louis D'Onofrio Executor of Louis D'Onofrio Estate & Mary Mezzanotte Estate" and the buyer as "Frank Frumento," the plaintiff herein. The trial court found that D'Onofrio, who signed the agreement after Mezzanotte, "had not been approved as administrator of his father's estate, nor had he been granted permission for the sale of the deceased's interest in the property . . ." at the time when he signed it. D'Onofrio was approved by the Probate Court as administrator d.b.n. on September 10, 1979, and he received permission from that court to sell the property that same day.

[4] The trial court found that Mezzanotte had not been aware of the subdivision of the property as she did not have knowledge of, nor was she involved in, the successful efforts of D'Onofrio to that end in 1978. She was also unaware that the subdivision had resulted in the property being taxed at a higher valuation.

[5] At the time Mezzanotte signed the agreement she was aware of the possibility of a foreclosure by the city of West Haven for back taxes; Greenberg had discussed this with her. She was examined and cross-examined at some length as to what appeared on the agreement which she signed on August 21 or 22. On direct examination by her attorney, Mezzanotte was asked whether she was ever requested "at a subsequent date to sign an amendment contract or subsequent contract." She answered in the affirmative and told the court: "Yes, he, [sic] I had to sign another one that gave lot numbers and he [said], 'This is for tax purposes . . . .'"

stituted without Mezzanotte's knowledge. Apparently she understood that Greenberg would contact her later concerning an actual date for the closing.

Early in September, 1979, Mezzanotte and her daughter became aware that the land had been cleared and Mezzanotte's daughter called Greenberg to ask him about this since the closing had not yet taken place.[6] Greenberg's response was unsatisfactory to her. At this point, a definite date for the closing on the sale of the land had still not been scheduled. "Sometime in September" Greenberg advised Mezzanotte that there was to be a closing "sometime in October."

In support of his claim for a decree of specific performance, the plaintiff points to certain direct testimony of Mezzanotte that sometime in October, 1979, she informed Greenberg that she would not attend a closing. There is no evidence of the date in October of this "closing" and the trial court so found. In any event, the plaintiff testified that his attorney's office informed him "[s]ometime in October . . . [t]wo days before the closing . . . [that] it was off completely." The plaintiff thereafter brought this action seeking specific performance of the agreement for the sale of the realty.

After a trial to the court, a judgment was rendered in which the court refused to order a specific performance. The trial court grounded its decision on its conclusion that the plaintiff, who had "the burden of proving that he was ready, willing and able to close, and that the defendants neglected to convey the property . . . failed to prove by a fair preponderance of

---

[6] Mezzanotte's daughter, Carmella Pugno, testified that she "called [Greenberg] because we had heard the land was being cleared and saw in fact that it had been and there hadn't been any closing or any date we were aware of, and I called to tell him that and that my mother was not happy about that, since there had been no closing." Greenberg was not told at this time that Mezzanotte did not want to go through with the closing.

the evidence that he would and could close on the property on August 15, 1979, or August 31, 1979, the only closing dates which appear on the agreement of sale." This appeal followed.[7]

On this appeal, it is claimed that the trial court erred in: (1) refusing to permit the plaintiff and the defendant D'Onofrio to call Greenberg as a witness to testify at the trial based upon Mezzanotte's invocation of the attorney-client privilege; (2) finding that Mezzanotte

[7] For clarity, we must note at this point the position of the parties on this appeal. In the proceedings below, the plaintiff filed his complaint naming Mezzanotte and "Louis D'Onofrio, Jr., Administrator d/b/n of the Estate of Louis D'Onofrio" as defendants. The latter defendant (D'Onofrio) filed a "third party complaint" against Mezzanotte which alleged, inter alia, that because of Mezzanotte's failure to perform the contract, the D'Onofrio estate "sustained damages and in the future will sustain future monetary damages," and he sought monetary damages and "reimbursement for all costs of defense actions, counsel fees, and other monetary damages." Mezzanotte thereafter filed a "cross complaint" against the D'Onofrio estate claiming, inter alia, that the D'Onofrio estate "conspired . . . to defraud [her] out of her interest in [the] property . . ." in question for which she sought damages and costs. This cross complaint was later withdrawn. After the trial court rendered judgment denying specific performance, the plaintiff filed this appeal from the judgment in the main action. The trial court also rendered judgment in favor of Mezzanotte on the "third party complaint" brought against her by the D'Onofrio estate.

The defendant D'Onofrio estate filed both an appeal and a cross appeal. The only brief it filed in this court is its brief on behalf "of the defendant-appellant on the cross complaint." Although this defendant prevailed vis-a-vis the judgment denying specific performance, it claims in its brief filed in this court and in oral argument before us that specific performance should have been decreed and also that it should have prevailed on its "cross complaint" against Mezzanotte. The defendant D'Onofrio estate withdrew what it denominated as its "Cross Appeal" leaving only its appeal concerning the adverse judgment on its "third party complaint" against the defendant D'Onofrio. This leaves the D'Onofrio estate raising virtually identical claims of error as the plaintiff in that it urges that the plaintiff, in effect, carried his burden of proving his entitlement to a decree of specific performance including the allegation of his being ready, willing and able to close. The logical extension of this position, the defendant D'Onofrio estate argues, is that the trial court erred in not finding for it on its "third party complaint" against Mezzanotte. Therefore, in discussing the claims of error before us, we will simply refer to them as those of the plaintiff.

had not been made aware of a closing date other than the date which appeared in the sales agreement; (3) failing to find that the plaintiff was not required to tender performance because such tender would have been a futile act; (4) finding that the plaintiff was not ready, willing and able to purchase the property; and (5) not ordering specific performance where the contract contained all the essential elements of the agreement among the parties. On the other hand, the defendant Mezzanotte claims that the trial court properly found for her on the foregoing issues and makes further claims which we need not reach.[8] We find that the trial court properly refused to order the specific performance of the agreement.

We need address only those claims of the plaintiff which relate to the trial court's finding that he was not ready, willing and able to purchase the property, since those claims are dispositive of all others before us.[9] We first note in this regard that the plaintiff claims that the trial court erred in finding that Mezzanotte was never informed of a closing date other than that which

---

[8] These additional claims are that the agreement (1) is void because it was materially altered after its execution by Mezzanotte, (2) was entered into by Mezzanotte under her mistake regarding the subject matter of the agreement, and (3) is unenforceable under the Statute of Frauds.

We need not address these claims by the defendant Mezzanotte which relate to the validity of the agreement. Although no claim has been made that such issues were not raised below, it is implicit in the the trial court's memorandum of decision that it rejected such claims and found the agreement to be valid. To be properly before us, such claims should have been raised by the appellee Mezzanotte on a cross appeal under Practice Book § 3003 or by filing a preliminary statement of issues under Practice Book § 3012 (a). See *Lynch* v. *Davis,* 181 Conn. 434, 437, 435 A.2d 977 (1980); *Scoville* v. *Scoville,* 179 Conn. 277, 278 n.1, 426 A.2d 271 (1979).

[9] We note specifically that we need not address the plaintiff's claim relating to the trial court's refusal to permit Attorney Greenberg, Mezzanotte's counsel prior to trial and during the events relevant to this case, to be called as a witness by the defendant D'Onofrio and the plaintiff. There is no indication that his testimony would have been in any way related to the plaintiff's ability to perform the contract.

was stated on the agreement at which her presence was requested. In so doing, the plaintiff claims that certain direct testimony of Mezzanotte, which we have referred to above, establishes that she was informed of a "new closing date" by Greenberg, and when so informed, she stated that she would not attend the closing. The plaintiff maintains, therefore, that the trial court erred in its determination that "[a]t a minimum a date certain for [the] closing should have been communicated to [Mezzanotte]," that the "[p]laintiff had a responsibility to show that on that date certain he was ready, willing and able to consummate the deal," and that the plaintiff could not claim that to set such a time for performance would be futile. Even if we accept, arguendo, the plaintiff's claim in this regard, i.e., that Mezzanotte's refusal to appear at such a "scheduled" closing relieved the plaintiff of his duty to make an actual tender of performance; see, e.g., *Vachon* v. *Tomascak,* 155 Conn. 52, 57, 230 A.2d 5 (1967); specific performance was properly denied because the plaintiff, nevertheless, had not sustained his burden of proving that he was ready, willing and able to perform the agreement as he alleged.

In bringing this action, the plaintiff alleged in his complaint, inter alia, that: by written agreement, the plaintiff agreed to buy and the defendants agreed to sell the land in question; Probate Court approval had been received for the sale; the agreement provided that the sale and conveyance be completed by August 31, 1979; the defendant owners have not conveyed the property; and that "[t]he plaintiff was at all times and still is ready, willing and able to perform the agreement on his part according to its tenor. . . ." At the trial, the plaintiff, after testifying that he signed the agreement on July 16, 1979, indicated that from that "time until

the time of the closing date"[10] he had the "financial ability" to purchase the property.

The purchase price of the property was $35,000 and the plaintiff had paid $500 toward that purchase price as a deposit; thus he was obligated to pay $34,500 at the closing. In presenting proof of his "financial ability" to perform his obligation under the agreement, the plaintiff offered evidence in the form of two bank statements: one for the period August 31, 1979, to September 28, 1979, and another for the period September 28, 1979, to October 31, 1979. The first statement revealed a number of transactions on various dates throughout the statement period and, with the exception of one entry,[11] the plaintiff's daily balance never was above approximately $17,000. For about two weeks prior to September 28, 1979, his daily balance did not exceed $6000. The second statement revealed a number of transactions for various dates throughout the statement period and, with the exception of one entry,[12] the plaintiff's daily balance never was above approximately $23,000. This statement further discloses that from October 1, 1979, through October 26, 1979, his daily

[10] The plaintiff testified that when he signed the agreement it provided for a closing date of August 31, 1979. He further testified that the closing had been delayed more than one time and that "[t]here were a couple of [dates]" set for the closing. The plaintiff stated that it was "[s]ometime [in] October" that the closing was finally set down and he could not remember whether it was supposed to have occurred early or late in that month.

[11] The bank statement for the period August 31, 1979, to September 28, 1979, reveals that on the last day of that period the plaintiff's balance was $33,864.94. On the previous day, September 27, 1979, his balance was barely in excess of $5000.

[12] The only point in time at which the plaintiff had at least a $34,500 balance was on October 30 and 31, 1979. On these dates, the plaintiff's balance was $55,342.70. On October 29, 1979, his balance was $11,364.94. This latter figure was increased to $55,342.70 by a deposit of $43,977.76 on October 29, 1979. It bears noting that the complaint on which this case was brought and tried was filed in the clerk's office of the Superior Court for the New Haven judicial district on October 23, 1979, to which it was made returnable on November 13, 1979.

balance never exceeded approximately $5900. When questioned at the trial as to his ability to pay over the remaining $34,500 at a closing which was alleged to have been scheduled for several dates during the period of time covered by the bank statements despite the balances revealed by those statements, the plaintiff testified that he "had access to enough [money]" and that he could "get the money somewhere. Through my parents. . . . I know I could borrow from my father if I needed it." He further testified that he had no commitment from a bank to lend him money, and that he was to tender cash at the closing.[13]

It is important to recognize that in seeking specific performance, the plaintiff invoked the equitable powers vested in the trial court. "[A]n action for specific performance of a contract to sell real estate is an equitable action and is to be determined by equitable principles." *Morris* v. *Costa,* 174 Conn. 592, 599, 392 A.2d 468 (1978); *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.,* 148 Conn. 21, 25, 166 A.2d 710 (1960). The granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light of the settled principles of equity. See *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 18–19, 420 A.2d 1142 (1979); *Lanna* v. *Greene,* 175 Conn. 453, 457–58, 399 A.2d 837 (1978); *Morris* v. *Costa,* supra, 599; *Sidor* v. *Kravec,* 135 Conn. 571, 573–74, 66 A.2d 812 (1949); 6A Powell, Real Property ¶ 925 (1); 4 Pomeroy, Equity Jurisprudence (5th Ed.) § 1404; 71 Am. Jur. 2d, Specific Performance § 7.

As already noted, the plaintiff alleged in his complaint that he was "at all times . . . ready, willing and able

---

[13] Although the plaintiff testified that he knew he could borrow the money he would have needed from his father, he did not offer any evidence concerning his father's ability to make such a loan to him.

to perform" his obligations under the agreement. "In order to be awarded specific performance, the plaintiff had the burden of proving that he was ready, willing and able at all times to purchase the property. *Eastern Consolidators, Inc.* v. *W. L. McAviney Properties, Inc.,* 159 Conn. 510, 510–11, 271 A.2d 59 (1970)." *Allen* v. *Nissley,* 184 Conn. 539, 542, 440 A.2d 231 (1981). The plaintiff must meet this burden even in a situation where the defendant-seller indicates her refusal to participate in any closing. See, e.g., *Allen* v. *Nissley,* supra, 540–42. The only evidence submitted by the plaintiff to meet this burden was the two bank statements detailed above and his own testimony that he could have borrowed the additional funds needed for his performance of the agreement from his parents. The evidence offered by the plaintiff in support of this allegation clearly shows that he was not able to tender performance at any time from the date he signed the contract to the date when he brought this action, although he testified that he was "at all times" able to perform his end of the contract. The only point in time which the bank statements offered showed that he was able to perform was October 30 and 31, 1979, but this avails the plaintiff nothing. The specific "final" date for the closing, i.e., that time in October which the plaintiff claims was scheduled for the closing which Mezzanotte refused to attend, was found not to have been established at trial. It is clear, however, that the date for the claimed scheduled closing must have been at least one week prior to October 30, 1979, as indicated by the filing of the plaintiff's complaint in this case in the Superior Court on October 23, 1979. Thus, the only other evidence offered by the plaintiff to establish that he was able to tender performance prior to bringing this action was his own testimony regarding his ability to secure a loan from his parents. He offered no evidence of any promise or commitment by his parents to make any loan.

It has been stated that when a purchaser of land is left to depend upon a purchase price loan from a third party who is in no way bound to furnish such funds, the purchaser cannot be considered to be able to perform so as to be entitled to specific performance. See *Brazeal* v. *Bokelman,* 270 F.2d 943, 948 (8th Cir. 1959), citing *Suhre* v. *Busch,* 343 Mo. 170, 194–95, 120 S.W.2d 47 (1938); *Hendershot* v. *Amarillo National Bank,* 476 S.W.2d 919, 921 (Tex. Civ. App. 1972); see *Potter* v. *Ridge Realty Corporation,* 28 Conn. Sup. 304, 310, 259 A.2d 758 (1969); *Morere* v. *Dixon Real Estate Co.,* 188 So.2d 623, 627 (La. App.) (1966); 71 Am. Jur. 2d, Specific Performance § 61; 81 C.J.S., Specific Performance § 106. The Wisconsin Supreme Court, in discussing an "able" buyer in a case for a broker's commission, stated: "The authorities outside Wisconsin uniformly hold the word 'able' includes a reference to financial ability not only to make the initial payment required to meet the terms of the seller, but also to complete the contract of purchase according to its terms. A proposed purchaser cannot be said to be able to purchase when he is dependent upon third parties who are in no way bound to furnish the funds." *Peter M. Chalik & Associates* v. *Hermes,* 56 Wis. 2d 151, 161, 201 N.W.2d 514 (1972). This principle, in the circumstances of this case, is quite clearly applicable.

This court will overrule a trial court's decision only if it is clearly erroneous. " 'On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memoran-

dum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous.' *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221-22, 435 A.2d 24 (1980)." *D'Occhio* v. *Connecticut Real Estate Commission,* 189 Conn. 162, 179, 455 A.2d 833 (1983). The trial court correctly concluded that the plaintiff had not sustained his burden of proving that he was ready, willing and able to perform his part of the agreement. Our examination of the entire record, in the light of the claims of the parties, requires us to conclude that this was so from the time the plaintiff signed the agreement up to the institution of this action in October, 1979. Therefore, we must conclude that the trial court's decision is not clearly erroneous.

There is no error.

In this opinion the other judges concurred.