**OLD QUARRY ASSOCIATION**

v.

**Frank HICKEY, Anthony Rescigno and Josephine Rescigno.**

**Civ. No. B–85–459 (EBB).**

United States District Court,
D. Connecticut.

Aug. 15, 1986.

Lawrence Iannotti, Judith Ravel and David Schneider, Tyler, Cooper & Alcorn, New Haven, Conn., for plaintiff.

Lewis Schwartz, Schatz, Schatz, Ribicoff & Kotkin, Stamford, Conn., and Cynthia Schwartz, Schatz, Schatz, Ribicoff & Kotkin, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

ELLEN B. BURNS, District Judge.

The plaintiff, Old Quarry Association (the Association), brought this diversity action to quiet title to certain real property and for specific performance of a contract between plaintiff and defendant, Frank Hickey (Hickey), for the sale of the property. Plaintiff alleges that Hickey was induced by defendants Anthony and Joseph-ine Rescigno (the Rescignos) to breach the contract and that the Rescignos tortiously interfered in the contractual relations between the Association and Hickey. Further, it is alleged that the Rescignos engaged in unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn.Gen.Stat. § 42–110b *et seq.* In addition to an order of specific performance on the contract and a decree placing title to the property in the Association, plaintiff seeks an award of compensatory and punitive damages.

## A. FACTS

After a hearing on the issues of liability,[1] the court makes the following factual findings. The dispute concerns a piece of residential real estate at 115 Old Quarry Road in Guilford, Connecticut. This 2.2 acre tract of land, which includes approximately 300 feet of waterfront on Long Island Sound, is located within the Old Quarry Association, a landowners association chartered by the State of Connecticut. The Association was created in 1947 by Arthur Hall, who had planned to develop a residential community on the shore in Guilford. Hall had previously sold a number of lots to various individuals, retaining certain rights relative to the property for himself. The property which is the subject of this action was originally conveyed by Hall to James C. LaGrua by deed dated August 7, 1946. Each deed to the property conveyed by Hall contained a restrictive covenant which provided, in part:

> That in the event that the grantee shall elect in the future to sell or dispose of said premises in whole or in part, the grantor shall have the first option and opportunity of purchasing the same at a price to be fixed by the grantee and submitted in writing to the grantor.

The various restrictions and covenants in these deeds were specifically limited in time by Hall's life plus fifteen years. After the Association was chartered by the State in 1947, Hall transferred his rights under the deeds to the Association and provided the Executive Board of the Asso-

---

1. The case was tried on the issues of liability only and this memorandum is so limited.

ciation with the authority to make decisions concerning the exercise of the restrictive covenant at issue in this case.

In May, 1983, defendant Hickey purchased the property at 115 Old Quarry Road from the estate of Frank Stowell for $305,000. The sales agreement relative to this transaction specifically referred to the restrictive covenant granting the association a right of first refusal. Hickey, a full time resident of New York City, initially intended to spend weekends and vacations at the property in Guilford. In fact, Hickey only visited the property on several occasions but never spent a night there. At one point he engaged an architect to draw plans for an addition to the house on the property. Although the Executive Board approved these plans, the work never started and the property remained unused.

In May, 1984, Hickey notified Diana Granbery, the president of the Executive Board, of his intention to sell the property. The Board, apparently concerned about the deterioration of the property, decided to try to find a year-round resident to purchase from Hickey. Also in May, 1984, Leah Boyd, a real estate agent, became aware that Hickey was interested in selling the property. Boyd was contacted by the Rescignos, residents of Los Angeles, who indicated that they were interested in purchasing waterfront property in Connecticut. Boyd took the Rescignos to see the Hickey property. However, she mistakenly informed the Rescignos about the size of the lot and the extent of the waterfront, and the Rescignos concluded at that time that they were not interested in the property.

In May, 1985, Mrs. Granbery, having learned that David and Amy Jaffe, residents of Guilford, were interested in buying waterfront property in the town, met with the Jaffes to discuss the possibility of buying property in the Old Quarry. Mrs. Granbery ascertained that Mr. Jaffe owned and operated a business in Branford, that Mrs. Jaffe was active in community affairs in Guilford, and that the Jaffes intended to live in the Old Quarry year-round. On May 25, 1985, Mr. Jaffe, at Granbery's urging, contacted Hickey to determine whether he was still interested in selling the property. Shortly thereafter, the Jaffes were quoted a price of $525,000 for the property by Saundra Malvin, Hickey's Executive Assistant. Malvin told the Jaffes that the property was being offered at that price "as is." After seeing the property once more, the Jaffes agreed to the purchase price of $525,000 and, on June 10, 1985, submitted a proposed agreement of sale to Hickey along with a check for a down payment on the property.

During the time that the Jaffes had visited the property and had contacted Hickey, the Rescignos' interest in the property was renewed. At the end of May, 1985, Josephine Rescigno again visited the property with a real estate agent named Brian Piezsco. Mrs. Rescigno discovered that the lot was larger than she had previously been told by Leah Boyd and that there was nearly twice as much waterfront. Piezsco indicated that the price of the property was $550,000. The Rescignos thereafter directed their attorney, Charles Costanzo, to make an offer to Hickey of $550,000. Thereafter, both Costanzo and Piezsco indicated to the Rescignos that there was some problem in contacting Hickey to convey this offer. As a result, Mr. Rescigno telephoned Hickey's office in New York and spoke with Saundra Malvin. Rescigno informed Malvin of their offer of $550,000 and learned that another unspecified offer had been made on the property. Malvin indicated that she would discuss the Rescignos' offer with Hickey. Malvin later telephoned and spoke with Mrs. Rescigno. In the course of this conversation Mrs. Rescigno indicated that if Hickey had received an offer from someone else, they would be willing to add another $20,000 to their original offer of $550,000. Malvin again said that she would inform Hickey of the Rescignos' offer.

In early June, Richard Hoffman, Hickey's attorney, telephoned the Rescignos and stated that Hickey was interested in their offer of $570,000 for the property. After the Rescignos had visited the property once more, Hoffman said that he would draft a sales agreement to complete the transaction.

On June 10, 1985, Hoffman informed the Jaffes' attorney that an offer had come in on the property for $570,000 and that the agreement with Hickey to sell to the Jaffes for $525,000 would not be concluded. Mr. Jaffe was thereafter informed by Hoffman that, if the Jaffes would match the $570,000 offer, Hickey would be willing to sell to them. The Jaffes agreed and a contract of sale for $570,000 was drawn up. The Jaffes also submitted another check for a down payment on the property.

Notified that their offer had been matched, the Rescignos further increased their offer to $600,000. Richard Hoffman apparently decided at that point that "enough was enough", and he returned their proposed contract to the Jaffes along with their check for a down payment. He then informed the Rescignos that they had a deal at $600,000, and a contract between Mr. Hickey and the Rescignos was signed on June 15, 1985. Ex. 28.

The Jaffes at this point had apparently become frustrated in their dealings with Hickey. In mid-June, Diana Granbery contacted Amy Jaffe to inquire as to how the negotiations with Hickey were proceeding. Mrs. Jaffe described their course of dealings and indicated that two offers had been rejected by Hickey. Granbery informed the Executive Board of the Jaffes' situation at a June 19, 1985, meeting. The Jaffes thereafter indicated to Granbery that they were still interested in purchasing property in the Old Quarry Association. Prior to leaving on a trip to Europe on June 21, 1985, the Jaffes informed Granbery that they had executed powers of attorney authorizing their attorneys to transact real estate dealings on their behalf in the event that property became available while they were out of the country.

On June 20, 1985, Richard Hoffman wrote to Diana Granbery to inform the Executive Board that Hickey was planning to sell the property to the Rescignos for $600,000. The letter stated, in part: "Please advise me whether or not the Asso-ciation intends to exercise its right of first option to purchase the premises at the same price set in the contract with the prospective purchasers."

Upon receiving the letter from Mr. Hoffman, Mrs. Granbery inquired of the Jaffes' attorneys whether the Jaffes would be interested in purchasing the property for $600,000 if the Association exercised its option at that price. After being assured that the Jaffes were prepared to buy the property, Granbery contacted the Association's attorney to determine how to proceed. She also scheduled a meeting of the Executive Board to discuss the exercise of the option.

A meeting of the Executive Board was held on June 29, 1985, at which the Board reviewed an agreement between the Association and the Jaffes. This agreement bound the Jaffes to purchase the property from the Association for $600,000 if the option was exercised at that price.[2] There was also a provision in this agreement which relieved the Jaffes of their obligation to buy if other property became available. The Board ultimately voted to exercise the option and the agreement between the Jaffes and the Association was executed on July 1, 1985. Also on July 1, Diana Granbery sent a letter to Mr. Hickey which read, in part: "This is to advise you that Old Quarry Association does hereby exercise its right to purchase the real property òwned by you at 115 Old Quarry Road, Guilford, Connecticut for a price of $600,000, in accordance with the letter from Mr. Hoffman to Diana A. Granbery, President of the Old Quarry Association, dated June 20, 1985." This letter was accompanied by a proposed agreement of sale prepared by John Barnett, the Association's attorney.

On July 2, 1985, Richard Hoffman telephoned Mr. Barnett to acknowledge receipt of the documents sent by the Association and to discuss the possibility of changing the proposed closing date. Hoffman then contacted Charles Costanzo, the Rescignos' attorney, as well as the Rescignos them-

---

**2.** The Jaffes had at that point secured financing through a bank of up to $1,000,000 for the purchase and renovation of the property.

selves, to inform them that the association had exercised the option to purchase at $600,000. On July 3, 1985, Costanzo filed a copy of the June 15, 1985, contract between Hickey and the Rescignos on the Guilford land records.

Sometime in early July, 1985, the Rescignos engaged another lawyer, Robert Berchem, to represent their interests in connection with the property. On July 7, Mr. Rescigno sent a telegram to Frank Hickey which stated, in part, that "if the 'Old Quarry Association, Inc.' should exercise its option to purchase at $600,000, let this telegram be added as an addendum to the original contract and increase my offer to $620,000." On July 10, Attorney Berchem filed on the land records another copy of the contract between Hickey and the Rescignos setting a purchase price of $600,000 for the property.[3] Thereafter, Hoffman discussed the offer of $620,000 with the Rescignos and Hickey ultimately decided to opt for the additional $20,000.

On July 18, Mr. Hoffman telephoned John Barnett to inform him that the price of the property was now $620,000 and to inquire whether the Association would be interested in exercising its option at that price. Mr. Barnett insisted that the price of the property had been fixed at $600,000. Mr. Hoffman thereafter sent a letter to Mr. Barnett, inviting the Old Quarry Association to make an offer of $620,000 for the property. A proposed agreement of sale was sent with this letter.

On July 24, the Executive Board of the Association met and concluded that it had a valid contract with Hickey for the sale of the property at $600,000. The Association's attorney sent a letter to Mr. Hickey on that date demanding that he convey the property to the Association. When no response was received from either Mr. Hoffman or Mr. Hickey, the Association filed the present suit against Hickey for specific performance.[4] The Jaffes agreed to pay the legal costs of the lawsuit. A similar indemnification agreement was executed between the Rescignos and Mr. Hickey. On September 6, 1985, Hickey conveyed the property to the Rescignos by warranty deed. After an amended complaint was filed on September 15, 1985, naming the Rescignos as codefendants, the court issued an order restraining the Rescignos from using or altering the property pending the outcome of this litigation.

## B. BREACH OF CONTRACT

The Association initially argues that it had a valid agreement with Mr. Hickey and that he breached the agreement by selling the property to the Rescignos. In assessing Old Quarry's breach of contract claim, it is first necessary to characterize the nature of the Association's interest in the property as evidenced in the various deeds involved and to determine whether its rights were properly exercised so as to lead to the creation of a binding agreement. In this regard, the recent case of *Smith v. Hevro Realty Corporation*, 199 Conn. 330, 507 A.2d 980 (1986), is particularly instructive.

The deed by which Arthur Hall conveyed the property to James LaGrua in 1947 provided that, if the grantee decided to sell the property, "the grantor shall have the first option and opportunity of purchasing the same at a price to be fixed by the grantee and submitted in writing to the grantor." This restrictive covenant was to run with the land, and the provision was, in fact, contained in each subsequent deed. The provision granted to the Old Quarry Association, as a successor to the interests of Arthur Hall, a right of first refusal to purchase the property at a price to be fixed by the grantor. *See Smith v. Hevro Realty, supra*, 199 Conn. at 335, 507 A.2d 980. The language granting the right of first refusal does not give the Association the right to compel a sale, but requires that it be given the opportunity to purchase the

---

**3.** An additional provision was included in this contract which required Hickey to sell the property to the Rescignos in the event that the Association exercised its option but did not subsequently take title.

**4.** On August 14, 1985, the date this action was instituted, the Association also filed a notice of *lis pendens* on the land records.

property at a fixed price before the grantee contracts to sell to anyone else. *Id.* at 336, 507 A.2d 980; 1A Corbin on Contracts (1963) § 261, p. 472–73. That opportunity arises when the Association is notified of the price fixed by the grantee, and the right of first refusal at that point ripens into an option. *Smith,* 199 Conn. at 336, 507 A.2d 980. "An option is a continuing offer to sell, irrevocable until the expiration of the time period fixed by agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer." *Id.* In this instance, the deed provision requires the Association to exercise its right of first refusal within fifteen days after being notified of the price fixed by the grantor.

■ Applying this analysis to the facts before the court, the following conclusions may be drawn. Richard Hoffman, Hickey's attorney, sent a letter to the Executive Board dated June 20, 1985, informing the Board of Hickey's intent to sell to the Rescignos for $600,000. At that point, the Association's right of first refusal ripened into an option, and Hickey's offer to sell the property to the Association for $600,000 became irrevocable for fifteen days. The Association's letter of July 1, 1985, operated as an acceptance of that offer. Therefore, a contract was formed on July 1 which obligated Hickey to sell the property to the Old Quarry Association for $600,000.

■ The defendants, however, argue that no contract was ever formed between the Association and Mr. Hickey because the plaintiff's acceptance spoke only to price. Defendants assert that, to be valid, the acceptance would have to have been on the same terms and conditions as the Hickey-Rescigno agreement. Indeed, acceptance of an offer under an option contract must be "in exact accord with the terms of the option." *Smith, supra,* 199 Conn. at 339, 507 A.2d 980 *quoting* 1A Corbin on Contracts § 264, p. 523. The option at issue here required Hickey to offer the property to the Association at a fixed *price,* and the Association, in fact, accepted that price. Although the defendants argue that the specific terms and conditions of the trans-

action which fixed the price, i.e., the Hickey-Rescigno agreement, must necessarily be read into the offer to the Association, the court finds that there is no basis for such a construction of the deed provision.

The defendants also argue that the contract between Hickey and the Association is unenforceable because it fails to meet the requirements of the statute of frauds. Section 52–550 of the Connecticut General Statutes provides that any agreement for the sale of real property or any interest in or concerning real property must be in writing and signed by the party to be charged. The statute requires that the written memorandum "stat[e] the contract 'with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof ... and these essentials must at least consist of the subject of the sale, the terms of it and the parties to it, so as to furnish evidence of a complete agreement.'" *Lynch v. Davis,* 181 Conn. 434, 438, 435 A.2d 977 (1980) *quoting Montanaro v. Pandolfini,* 148 Conn. 153, 157, 168 A.2d 550 (1961). The memorandum may consist of several related writings which, when taken together, describe the essential terms of the contract. *Heyman v. CBS, Inc.,* 178 Conn. 215, 221, 423 A.2d 887 (1979).

The operative writings in this case are the original deed provision, the June 20th letter from Mr. Hoffman to the Association informing the Association of the Rescigno offer and the July 1 letter from Diana Granbery to Mr. Hickey. Defendants argue that these writings are, in several respects, insufficient to satisfy the statute of frauds.

■ Defendants initially assert that Frank Hickey, the party to be charged in this instance, did not sign any of the writings. The June 20, 1985, letter, however, in which the property was offered to the Old Quarry Association for a price of $600,000, was signed by Richard Hoffman, Mr. Hickey's attorney. The evidence in this case clearly establishes that Hoffman was acting as Hickey's agent with respect to the sale of the property. Under the circumstances, Mr. Hoffman's signature on

the June 20 letter is sufficient for purposes of the statute of frauds. *See Birnbaum v. Connecticut Equities,* 4 C.L.T. No. 40, p. 15 (Conn.Super.Ct. Oct. 2, 1978); *Lipkowitz v. Freedman,* 96 Conn. 84, 87, 113 A. 152 (1921).

■ The defendants further argue that the writings do not evidence a complete agreement between the parties sufficient to satisfy the requirements of the statute. As has been stated, the written agreement must identify the subject of the sale, the essential terms, and the parties to the agreement. *See supra.* Taken together, the operative writings clearly identify the property and the parties to the transaction and state a purchase price of $600,000. The defendants nevertheless maintain that the contract is unenforceable because the terms of payment are not defined. However, since there is nothing in the written memoranda to indicate that the parties agreed to the terms of payment, there is a presumption that the entire purchase price would be paid in cash. *Saracco v. Koury,* 12 C.L.T. No. 22, p. 20 (Conn.Super.Ct. April 8, 1986); *Santoro v. Mack,* 108 Conn. 683, 689, 145 A. 273 (1929). Similarly, although the written agreement fails to specify when the contract is to be performed, a reasonable time for performance will be implied. *Breen v. Phelps,* 186 Conn. 86, 93, 439 A.2d 1066 (1982). The court therefore concludes that the written memoranda demonstrate that Mr. Hickey and the Old Quarry Association came to a complete agreement for the sale of the property and that the statute of frauds has been satisfied.

■ In an effort to avoid the agreement, the defendants mount an attack on the right of first refusal itself. They argue that its exercise, which led to the creation of the contract between Mr. Hickey and the Association, was ineffective for two reasons. First, defendants assert that the right of first refusal, as an interest inuring to the benefit of the Association, violates the rule against perpetuities. The rule provides that "no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Connecticut Bank & Trust Co. v. Brody,* 174 Conn. 616, 623, 392 A.2d 445 (1978). The defendants acknowledge that the interests retained by Arthur Hall, via the original deeds, including the right of first refusal, were limited by his life plus fifteen years. They maintain, however, that the December 31, 1947, document, by which Hall transferred his interests to the Association, did not contain this limiting language. The interests created by this latter document being unlimited as to time, defendants argue that they are violative of the rule against perpetuities. This argument appears to be premised on the notion that Arthur Hall would have been capable of transferring an interest to the Association greater than that to which he was entitled. Logic defies such reasoning. The memorandum dated December 31, 1947, transferred to the Association only those rights and interests in the property which Arthur Hall then held. The Association's right of first refusal therefore is an interest limited in time by Arthur Hall's life plus fifteen years and does not violate the rule against perpetuities.[5]

■ The defendants further argue that the right of first refusal is void as a restrictive covenant which amounts to an unreasonable restraint on alienation. Being limited as to time, the right is not unreasonable in terms of duration. *See supra.* Defendants argue that the right of first refusal is nevertheless unreasonable because it does not serve a legal or useful purpose. However, to the extent that the deed provision granting the right of first refusal to the Association is designed to protect "the financial and social integrity" of the community, the exercise of the right is permissible. *See Jones v. O'Connell,* 189 Conn. 648, 654, 458 A.2d 355 (1983). In addition, the provision does not prevent the seller from transferring the property at a reasonable price; it merely requires that the property be offered to the Association at a price to be determined by the seller. In this case, the Association has opted to purchase

---

5. The parties have stipulated that Arthur Hall is still alive.

the property for $600,000. The court is not prepared to conclude that Mr. Hickey has been deprived of the opportunity to receive a reasonable price for the property or that the provision amounts to an illegal restraint on alienation.

■ The record before the court, then, reveals that the Old Quarry Association's right of first refusal was properly exercised and that a contract was formed as of July 1, 1985, which obligated Mr. Hickey to sell the property at 115 Old Quarry Road to the Association for a price of $600,000. The record further demonstrates that Mr. Hickey refused to honor that agreement and breached the contract by later selling the property to the Rescignos at a higher price. The court therefore finds in favor of the Association on its breach of contract claim.

## C. SPECIFIC PERFORMANCE

By way of a remedy for the breach, the Association seeks an order requiring Mr. Hickey to specifically perform his obligations under the contract.[6] The remedy of specific performance is undoubtedly available in cases involving contracts for the sale of real estate. *See Ecos Corp. v. Conlon*, 4 Conn.App. 572, 574, 495 A.2d 1111 (1985). An order of specific performance is an equitable remedy "which rests in the broad discretion of the trial court depending on all the facts and circumstances" of a particular case. *Frumento v. Mezzanotte*, 192 Conn. 606, 615, 473 A.2d 1193 (1984). To be awarded specific performance, the Association has the burden of establishing that it was ready, willing and able at all times to purchase the property. *Id.* at 616, 473 A.2d 1193.

■ The evidence established that the Association was prepared to exercise its option to purchase the property for a price of $600,000 and that it had, in turn, executed an agreement requiring the Jaffes to purchase the property from the Association at that price if the option was exercised. The Jaffes had arranged financing of up to $1,000,000 for the purchase and renovation

of the property. Defendants assert that the Association was not ready, willing and able to purchase the property because its agreement with the Jaffes provided the Jaffes with an "out" in the event that they purchased other property. There is no indication, however, that the Jaffes at any time sought to be relieved of their obligation to purchase the property from the Association. The agreement between the Jaffes and the Association clearly evidences a commitment on the part of the Jaffes to provide $600,000 for the purchase. Such a commitment is sufficient to demonstrate that the Association was and is ready, willing and able to purchase the property from Mr. Hickey. *Cf. Frumento, supra*, 192 Conn. at 616–17, 473 A.2d 1193. In view of this fact, and because the contract is in all other respects fair and equitable, the court concludes that an order of specific performance is appropriate.

## D. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

The Association has alleged that the defendants Anthony and Josephine Rescigno tortiously interfered with the Association's contractual relations with Frank Hickey. Specifically, it is alleged that the Rescignos "induced" Hickey to breach his contract with the Association for the sale of the property.

To prevail on a claim of tortious interference with contractual relations, a plaintiff must demonstrate: (1) the existence of a contractual or beneficial relationship; (2) that the defendants, knowing of that relationship, intentionally sought to interfere with it; and (3) loss to the plaintiff as a result of the interference. *Solomon v. Aberman*, 196 Conn. 359, 364, 493 A.2d 193 (1985). As has been discussed, *supra*, the Association did enter into a contract with Mr. Hickey to purchase the property at 115 Old Quarry Road. It has not been established, however, that the Rescignos actually knew of the existence of that contract at the time they offered Hickey $620,000 for

---

6. The Association also seeks an award of damages on the breach of contract claim. A hearing on the issue of damages is to be scheduled by the court.

the property. "Intentional interference ... presupposes knowledge of the plaintiff's contract or interest, or at least of facts which would lead a reasonable person to believe that such interest exists. Without such knowledge there can be no intent and no liability." Prosser and Keeton on Torts § 129, p. 982 (5th ed. 1984).

Clearly, the Rescignos knew that any sale of the property was subject to the Association's right of first refusal. They were also aware that, in response to Mr. Hoffman's letter informing the Association of the Rescignos $600,000 offer, the Association sent a letter to Mr. Hickey indicating that it would exercise its option to purchase at that price. Whether a contract existed between Mr. Hickey and the Association at that point has been the central issue throughout this litigation. The court has determined that a contract was formed as of July 1. There is no basis, however, for charging the Rescignos with knowledge that an agreement had been concluded at that point.

■ Further, the court is not satisfied that there was "tortious" interference as that term has been defined in the case law. This element of the cause of action "may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously." *Blake v. Levy,* 191 Conn. 257, 261, 464 A.2d 52 (1983), *quoting Kecko Piping Co. v. Monroe,* 172 Conn. 197, 201–02, 374 A.2d 179 (1977). The Association has failed to satisfy its burden in this regard. The Rescignos were intent on obtaining waterfront property in Connecticut and were willing to match other offers made on the Hickey property. Their testimony reveals that they believed they were justified in offering Mr. Hickey more than the Association had offered. There is no indication that the Rescignos were aware, at any point, that there was a binding agreement between the Association and Mr. Hickey or that they acted maliciously in "inducing" Mr. Hickey to breach his agreement with the Association. The court is simply not prepared to conclude that the Rescignos'

conduct was such as to provide a basis for imposing liability. Therefore, the Association's tortious interference claim is unavailing.

### E. CUTPA

The Association has also alleged that the Rescignos' conduct constitutes a violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn.Gen.Stat. § 42–110b *et seq.* CUTPA provides a remedy for a "... person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b ...'" Conn.Gen.Stats. § 42–110g(a). Section 42–110b proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The Association asserts that the Rescignos violated CUTPA by interfering in the Association's contractual relations with Mr. Hickey and also by filing a "false" document on the Guilford land records. In response to plaintiff's CUTPA claim, the defendants assert that the Association has no standing to bring the claim, that the private nature of this dispute does not give rise to a CUTPA violation, and that the conduct involved does not fall within that proscribed by the statute. Because the court agrees with the contention that the Rescignos' actions were not "unfair" or "deceptive" within the meaning of CUTPA, it need not address the defendants' other arguments.

■ In determining whether a practice is "unfair" within the meaning of CUTPA, it is necessary to consider

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

*McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 568, 473 A.2d 1185 (1984) quoting *Conaway v. Prestia,* 191 Conn. 484, 492–93, 464 A.2d 847 (1983). With respect to the argument that the Rescignos interfered with the contractual relations of the Association and Mr. Hickey, the court concluded in Part C of this ruling that there is no basis for sustaining such a claim against the Rescignos. In making offers and ultimately executing a contract with Mr. Hickey for the sale of the property, the Rescignos were acting in a manner which they believed was permissible and which the court, in view of the uncertainty of the Association's rights at the time, is not willing to deem unfair, malicious or unscrupulous.

 The Association also maintains that the July 10, 1985, filing of the Hickey-Rescigno contract on the Guilford land records amounts to a CUTPA violation. It is true that at the time this contract was filed, reflecting a purchase price of $600,000 for the property, Mr. Rescigno had sent a telegram dated July 7, 1985, to Mr. Hickey informing Hickey that he would be willing to increase his offer to $620,000. However, as of July 10, 1985, the date of the filing of the contract, Hickey had not responded to the Rescignos concerning their increased offer. In addition, the attorney who filed the contract had been retained by the Rescignos just one week prior to July 10. The contract filed on that date contained a paragraph which provided that if the Association exercised its option but did not subsequently take title to the property, Hickey was required to convey it to the Rescignos. This provision was not in the contract that had been previously filed. These actions do not appear to be in any way "unfair" or "deceptive." It is reasonable to conclude that the Rescignos' attorney was acting in his client's best interests and as he believed was proper in view of the circumstances. Once again, it was not at all clear as of July 10, 1985, whether the Association had validly exercised its option and concluded an agreement with Hickey for the sale of the property. The filing of the contract with the additional provision was apparently an attempt to protect the Rescignos' interests in the event that an agreement between Hickey and the Association was never concluded. The court does not believe that this type of conduct offends public policy or is in any way immoral or unscrupulous. Accordingly, the Association's CUTPA claim against the Rescignos must fail.

## F. DUE PROCESS

By way of a counterclaim, the Rescignos assert that the Association acted to deprive them of their rights under the Fourteenth Amendment to the United States Constitution.[7] Specifically, the defendants maintain that the Association is a municipal corporation which acted in the course of its governmental authority to deprive the Rescignos of property without due process. The thrust of this argument appears to be that the Association exercised its right of first refusal to "steer property to favored individuals" and that the Rescignos were entitled to some type of hearing before the Association prior to the exercise of the right in favor of another party.

 To prevail on their procedural due process claim, the Rescignos must, as a threshhold matter, establish that they have been deprived of a cognizable property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Their only claim in this regard, however, is that they had a strong desire to buy the Hickey property and wanted the opportunity to convince the Executive Board of the Old Quarry Association that they would make good neighbors. This argument simply does not implicate a constitutionally protected interest. The Rescignos' due process claim is therefore without merit.

## G. CONCLUSION

Accordingly, as to liability only, the court finds for the plaintiff on the first and sec-

---

7. This particular argument was initially raised as a counterclaim by Frank Hickey, but was briefed alleging only a violation of the Rescig- nos' constitutional rights. The court must assume that Hickey has abandoned the counterclaim.

ond counts of the amended complaint and on the Rescignos' counterclaim. As to Counts Three and Four of the Amended Complaint, the court finds in favor of the defendants.

A status conference shall be held in this matter on September 9, 1986, at 5:00 p.m.

SO ORDERED.