[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action in two counts: the first, for specific performance by the plaintiff buyer of a contract to purchase a three-family home from the defendant's decedent; and the second, in the alternative, for a return of a deposit. The defendants, Francesca Rodrigues, executrix of the estate of Amelia Santiago, and John Gonsalves, Santiago's foster grandson, have admitted the execution of the contract, but deny its validity on the ground of Santiago's mental incapacity at the time she signed the contract.
The plaintiff is a real estate buyer, developer and renovator, and had purchased or had under option properties on Talman Street in Norwich, immediately adjacent to and on both sides of the decedent's property. The decedent resided on the third floor of the premises with Gonsalves, and the first and second-floor dwelling units were occupied by tenants. During the previous year, the decedent had been having difficulties with the tenants and had engaged an attorney to evict them. The tenants were apparently not paying rent, vandalizing their apartment and overcrowding it. The decedent was 95 years old, somewhat hard of hearing and had difficulty seeing, but was intelligent, and could read and write and was ambulatory until her admission to the hospital on June 28, 1988.
Sometime in early 1988, the plaintiff stopped in to see the decedent while Gonsalves was there, introduced himself and advised them that he was interested in buying the CT Page 371 decedent's property, as he had purchased adjoining properties on either side, and, if the property came on the market, to let him know. The decedent told him she was not interested in selling. About three weeks later, the plaintiff returned to the decedent's home, and with Gonsalves also present, the decedent told the plaintiff of the problems she was having with her tenants and that she now wanted to sell, and they agreed to meet a week later. The general condition of the decedent's property was poor and the condition of the adjoining properties ranged from poor to uninhabitable.
During the next meeting, the decedent suggested a price of $30,000, together with the right to reside in the premises for one year after the sale for no rent, to which the plaintiff agreed, and the plaintiff asked if she wanted her attorney to draw the contract. She said no.
The plaintiff's attorney, Budzik, drafted the contract (Plaintiff's Exhibit A), which the plaintiff brought to the hospital when he learned from Gonsalves that the decedent had been admitted the evening before. There, the decedent requested that he bring Gonsalves to the hospital, which he did, on the same day, June 29. The plaintiff gave each a copy of the contract and read the contract to the decedent, in the presence of Gonsalves. She wanted to be certain that she could continue to reside in the house for one year after the sale, and the plaintiff reread the pertinent provision to her. The parties signed duplicate copies of the contract, which were witnessed by Gonsalves and another patient's husband, who could not be located at the time of trial.
The plaintiff gave the decedent a check for the contract deposit of $2,000, Plaintiff's Exhibit B; the decedent endorsed it, Gonsalves also endorsed it and obtained the proceeds, apparently because the decedent said that since he was going to get the house anyway, he should also have the check. Later, while she was in the hospital, she received a tax bill for the property, which she gave to Gonsalves with instructions to relay it to the plaintiff, as it was now his responsibility, and Gonsalves did so.
The plaintiff then instructed his attorney to schedule a closing, met the decedent twice at Hamilton pavilion (a nursing home to which she had been transferred upon her discharge from the hospital) to discuss the closing, which was not held because her death intervened.
On July 12, 1988, plaintiff gave Attorney Budzik a check for $27,000, which she deposited in her client's fund CT Page 372 account, Plaintiff's Exhibit C, and plaintiff testified that at all times he was ready, willing and able to purchase the property pursuant to the contract.
 II.
The defendants' special defense alleges that Santiago was mentally incapable of executing the contract and therefore imposed upon them the burden of proof on that issue. The defendants submitted into evidence the entire hospital record of Mrs. Santiago's care and treatment therefrom her admission on June 28, 1988 to her discharge on July 11, 1988. The nurses' notes record observations of the decedent as alert and oriented, and observations of her confusion and disorientation, both before and after the signing. The neurologist's report of July 1, 1988, stated that she was awake, alert and oriented, spoke with a (sic) spanish accent, and that it was easy to converse with her. The registered nurse who examined her within two hours of her admission on June 28 noted that she was alert and oriented, and the emergency room doctor who examined her and had her detailed history available made no note of mental deficit of confusion.
Jeannie Stoddard, the decedent's neighbor, who saw her a few days before and after the signing, the decedent's friends, Wrigley and Herrins, who saw her between 8 and 9 p.m. on the date of the signing, and the defendant Gonsalves, who was present at the signing, all opined that Mrs. Santiago was not mentally capable of agreeing to sell her house. Notably, all of these witnesses testified that she was intelligent, could understand English when spoken slowly and could be and that in the conversations each of these witnesses had with her close in time to the signing she made appropriate responses and was very clear in discussing her tenant problems, despite her agitation over them. More importantly, the defendant Gonsalves was present at the signing, and not only was a witness to the contract, but raised no objection to it.
Another neighbor, who knew the decedent for about ten years, called by the plaintiff, testified that he had no difficulties understanding her when he saw her shortly before the signing, when she told him she had agreed to sell the house; and three to four days after in the hospital, when she told him she had sold it.
The defendant executrix, Francesca Rodrigues, who worked in the hospital, knew Mrs. Santiago for 40 years, was fluent in Portuguese and conversed with her in "Cape Verdean Portuguese," saw her twice on the day of the signing, first at CT Page 373 about noon and again about 2:30 p.m. She testified that the decedent responded to her appropriately on both occasions and that she didn't feel anything was wrong with the decedent mentally on either visit.
The time honored test of the mental capacity of a person to make a contract or to execute a deed is whether at the time of the transaction she possessed understanding sufficient to enable her to comprehend the nature, extent and consequence of the transaction. Nichols v. Nichols, 79 Conn. 644,657 (1907). Also, contracts of an incapable person made during lucid intervals are valid.
What is before the Court on this issue are opposing lay opinions, together with hospital records, which tend, when taken on the whole, to support the plaintiff's position that the decedent had the necessary mental capacity at the time of signing to agree to sell her house. The opinions of the defendants' witnesses are not supported, moreover, by the facts to which they testified. When coupled with the presumption of sanity in the performance of legal acts which the defendants needed to overcome, the defendants' evidence failed to meet their burden of proof that the decedent was mentally incapacitated when she signed the contract to sell her home. The defendants also, as part of their special defense, alleged that the decedent was induced to sign the alleged agreement without awareness that it was a contract to sell her home, and that she was "prevailed upon to sign the agreement." The Court deems this special defense to allege fraud on the part of the plaintiff in the inducement of the contract. Fraud requires proof by clear and convincing evidence, and the defendants failed to meet this burden. Therefore, the Court finds that the contract was duly executed and is valid; and further finds that it was breached by the defendant's executrix.
 III.
The finding of breach does not end the inquiry, as the next issue to be determined is whether the plaintiff is entitled to specific performance. The Court finds that the plaintiff had paid the decedent the $2,000 earnest money and had $27,000 available in his attorney's clients' funds account, for a total of $29,000, rather than the $30,000 contract sale price. The contract, however, also provided that at closing, the seller would post a security deposit of $1,000 to be held by the plaintiff until the expiration of the one-year lease. Under these circumstances, and on the credible evidence, the Court finds that the plaintiff met his burden to prove that he was ready, willing and able to purchase the CT Page 374 property pursuant to the contract.
It is important to recognize that in seeking specific performance, the plaintiff invokes the equitable powers of the trial court. "An action for specific performance of a contract to sell real estate is an equitable action and is to be determined by equitable principles. (citations omitted). The granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in the light of the settled principles of equity." Frumento v. Mezzanotte, 192 Conn. 606,615 (1984). Specific performance is not a matter of right, but a matter of balancing the equities.
Although the defendants' special defense alleged that the value of the premises was greatly in excess of the contract price, they offered no evidence that this was so, either at the time of the breach or at the time of trial. There was also no evidence as to the value of the lease to be reserved by the seller for one year for $1, nor the cost of the burden of evicting the troublesome tenants which was to be assumed by the plaintiff. In fact, there was testimony that the property was eventually condemned as uninhabitable. There was no credible evidence that the plaintiff overreached or was guilty of fraud to obtain the contract, or that specific performance would constitute a hardship to the defendants or a windfall to the plaintiff. In the light of the plaintiff's purchase of adjoining properties, and that the decedent's premises were "central" to his plans, and noting that the contract contains no clause limiting a remedy in case of breach to damages, the Court has balanced the equities and finds that specific performance is warranted.
Accordingly, judgment may enter on the first count for the plaintiff, and the defendant executrix is ordered to convey good and marketable title to the plaintiff, subject to easements and restrictions of record, real estate taxes due and owing as of July 1, 1988, upon his payment to the decedent's estate of the sum of $28,000, less credit to the plaintiff for any unpaid interest or lien fees due on said real estate taxes. If said real estate taxes were paid by the defendants, then they shall be reimbursed by the plaintiff. The parties shall be responsible for closing costs in accordance with the prevailing custom in New London County. If the premises were specifically devised by Santiago's will to Gonsalves, he is ordered to join in the executrix' deed.
Judgment shall enter for the defendants on the second count. CT Page 375
No costs shall be taxed.
TELLER, J.