James P. PURVIS et al., Appellants,

v.

UNITED STATES of America for the Use and Benefit of ASSOCIATED SAND & GRAVEL CO., Inc., a corporation, et al., Appellees.

No. 19366.

United States Court of Appeals Ninth Circuit.

April 27, 1965.

Donald McL. Davidson, William L. Dwyer, Ferguson & Burdell, Culp, Dwyer & Guterson, Seattle, Wash., for appellants.

J. P. Hunter, Julian C. Dewell, Anderson & Hunter, Everett, Wash., for appellees.

Before JERTBERG, Circuit Judge, MADDEN, Judge of the Court of Claims, and MERRILL, Circuit Judge.

MADDEN, Judge:

This suit was brought by Associated Sand & Gravel Co., Inc., which had supplied labor and materials to Purvis, who had constructed certain buildings for the United States but had not, so Associated asserted, paid Associated all that he should have paid it for its labor and materials. Purvis, as prime contractor, had been required by the United States to furnish a bond guaranteeing that he would pay his labor and material bills. The defendants in this suit were Purvis and his bondsman. See 40 U.S.C. § 270b.

The buildings which Purvis constructed for the United States constituted the Federal Science Pavilion at the Seattle World's Fair. Pursuant to an invitation by the United States for bids on the project, Purvis, in January, 1961, submitted a bid. His was the low bid and, about the middle of February, 1961, the United States awarded him a contract to build the entire pavilion for an amount somewhat in excess of $3,000,000. Even before Purvis was awarded the prime contract, he had been negotiating with Associated for a subcontract covering the precast concrete work which would be required in the performance of the prime contract, if Purvis should get that contract.

On February 24, 1961, after Purvis had received the prime contract, and after much negotiation between Purvis and Associated, Purvis sent to Associated an unsigned proposed subcontract for the precast concrete work. The price set in the proposal was $1,032,500, which price was later increased, by additions not here in controversy, to $1,051,-453.25. The proposal contained, among other paragraphs, paragraphs 10 and 12:

"10. The full assistance of Associated in coordination of the delivery of items to the job to conform with an erection schedule supplied in advance by the contractor and accepted by Associated Sand & Gravel Co. in order that no storage materials is required on the job site. Associated will store all precast materials on its premises until requisitioned.

\* \* \* \* \* \*

"12. Supplier agrees to furnish materials to meet the approved job schedule with no delays other than those caused by factors not within the control of Associated."

On February 27, before Associated had agreed to the Purvis proposal, representatives of the parties met to set up an "erection schedule," and an "approved job schedule," pursuant to paragraph 10 quoted above. Messrs. Cooney and McHugh, representing the erection subcontractor, were also present at the request of Purvis' representative. At this meeting, after discussion, Purvis' representative gave Associated's representatives an erection schedule. The schedule was copied by Hutsell, one of Associated's representatives, in his note-book. It was also copied by Cooney. Whittaker, Purvis' representative, had a writing showing the schedule, but his writing was not available at the trial.

On February 28, Duecy, Associated's highest ranking representative in the transaction involved in this suit, telephoned Purvis, who had not been present at the February 27 conference, told him that a schedule had been agreed to at the February 27 conference, signed the Purvis proposed draft and mailed it to Purvis with an accompanying letter which said:

"Dear Pat:

In keeping with my telephone conversation with you today regarding item eleven:

We will expect to arrive at a mutually agreeable solution to this paragraph. As you know from my conversation, the furnishing of the strand and duct material necessary

for the cast in place concrete on the dome slabs is not in keeping with my understanding; however, in view of your conflicting understanding, we will work out a satisfactory adjustment to this matter."

In the telephone conversation referred to in the above letter, Purvis had said to Duecy, with reference to the strand and duct item, that that was an item that could be discussed; that if he, Purvis, should make any money on the job there would be no problem. Duecy had said he did not feel that Associated "should carry that." Then Purvis had said:

"Let's get this thing going. We'll talk that over afterwards. It's not a big item. We'll straighten it out."

As we have seen, Duecy, after this telephone conversation with Purvis, signed the contract and sent it to Purvis with the letter which we have quoted. Duecy did not delete paragraph 11 from the draft. On March 8, Purvis signed the contract and sent a signed copy to Duecy for Associated. He did not accompany it with any comment on Duecy's letter of February 28. The parties then went to work on the building of the pavilion. Nothing more seems to have been said or written about the strand and duct item until months later when the time arrived for the furnishing of the strand and duct material. Purvis asked Associated to furnish it. He said, "You get the material and we'll *wrastle* something out." Associated said it would furnish it, but would bill Purvis for the cost. Purvis said, "Go ahead and bill me." We do not know in what tone of voice Purvis said this, but it seems that Duecy did not take that statement as a promise which disposed of the unsettled question.

Associated's costs, without profit, for the strand and duct item were $9,355.77. In the settlement of their affairs, Associated demanded that amount, on account of the strand and duct item, and Purvis refused to pay it. That is one item of Associated's claim in the instant suit. But the item has an important place in this litigation because Purvis argues (1) that the parties never reached an agreement on the strand and duct item, and (2) that because they never reached an agreement on that item they never made a contract at all, and all the work which Associated did for Purvis was done without a contract and the amount to which Associated became entitled for doing it is still open for determination on a quantum meruit basis.

We agree with point (1) of Purvis' argument. But we think that to validate point (2) would be to create a notable instance of the phenomenon of a very small tail wagging a very large dog. It will be remembered that the price which the parties did agree on in their negotiation, laying aside for the moment the strand and duct item, was $1,051,-453.25. The strand and duct item actually cost $9,355.77. We have quoted Purvis as saying, "It's not a big item." Associated did not regard it as a crucial item in the contract as a whole or it would not have left the subject unresolved and proceeded to do more than a million dollars worth of work.

It is clear that the parties did not intend to work without a contract; that they thought they had a contract. Associated says that they did have a contract, that it called for a payment of $1,051,-453.25, and did not include the strand and duct work. Purvis would not deny that the parties thought they had a contract, but he argues that, regardless of what they thought, the law says that they did not have a contract because their minds never met on whether the strand and duct work should or should not be done by Associated and included within the price written in the contract. We disagree with Associated's contention that the work in question was covered by the contract which they made. It is clear that they had no such intention. If, nevertheless, the contract did cover it, it is a result of legal magic, and not of anything intended by the parties. But rarely does the law make for parties a contract which they have expressly refused to make for themselves.

It is not the law, though Purvis contends that it is, that when the parties,

in contracting leave for further negotiation some element of their contract the law will always conclude that they have made no contract at all. Whether or not they have made a contract is, ordinarily, for them to decide. Professor Corbin, in his text on Contracts, Vol. 1, § 29, says:

"We must not jump too readily to the conclusion that a contract has not been made from the fact of apparent incompleteness. * * * A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact. An expression is no less effective that it is found by the method of implication.

"Even though certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement."

And in Williston, Contracts (3d Ed.) at § 48, we find a similar discussion with regard to elaborate contracts in which certain minor matters are expressly left for future agreement, or are left in such an indefinite status as to be incapable of enforcement. This text says:

"It is evident that the question must be one of degree: Is the indefinite promise so essential to the bargain that inability to enforce that promise strictly according to its terms would make it unfair to enforce the remainder of the agreement."

In Restatement, Contracts, § 32, Illustration 11, is stated a case of a contract for the erection of a building for $30,000 but containing a provision that the character of the window fasteners should be subject to the further agreement of the parties. The stated conclusion is that the indefiniteness of the agreement with reference to this minor matter will not prevent the formation of a contract.

■ These authorities are saying what the law says, in many areas, that writings should be interpreted and applied *ut res magis valeat quam pereat.*

It would be destructive and disorderly to conclude that the entire million dollar enterprise out of which the instant controversy arises should be thrown open to litigation as to what the entire job was worth. The price of the strand and duct work was somewhat less than nine one-thousandths of the price of the whole job. It was indeed, as Purvis said, "not a big item."

■ The authorities referred to above do not answer the question of what a court should do about an item left for future agreement, but upon which the parties never in the future agreed. What the court should do is what is fair in the circumstances. In the instant case, Purvis' position was that Associated would be paid for the strand and duct work when it received the price set in the contract for its work as a whole. Associated's position was that if it did the strand and duct work it should be paid for it in addition to the contract price. Both parties contemplated and indeed agreed that they would negotiate the difference, since neither was willing to let the entire contract fall through because of their disagreement on this minor item. If they had later agreed, presumably their agreement would have been a compromise somewhere between zero and the cost of the strand and duct work. We conclude that Associated should receive $4,677.88 on this item.

■ Another item here in controversy, much smaller even than the strand and duct item, is a claim by Associated for $669.34 for "corbel repairs" on one of the panels manufactured by Associated which, long after it had been put in place in one of the buildings by the erection subcontractor, was found to need repairs. Purvis' superintendent asked Associated's superintendent to make the repairs. Associated had made corbel repairs many times in the course of the work, without charge and without regard to whose fault created the need for the repairs. This time Associated's superintendent did not directly say that there would be a charge for the repairs. He said something to the effect that they

would be done on the same basis as before. Conditions, however, were different in the respects that Purvis' equipment, which Associated had used in making the former repairs, was no longer available, and that the fair was now open so that the repairs could only be made at night after the visitors had left the buildings, and when Associated had to pay overtime wages. Associated's claim includes only these extra costs which it incurred. We think, however, that Associated may not recover on this claim. As plaintiff, it had the burden of supporting the equity of the claim. It did the work pursuant to what was, at best, a vague and indefinite arrangement, incapable of enforcement according to any express terms. The circumstances do not give rise to any clear equity in Associated on this item.

We turn now to the largest item in controversy between the parties, and recite with some repetition the events relevant to that controversy. Purvis had, on February 24, 1961, submitted to Associated a proposed draft of a subcontract, which draft contained paragraph 10, hereinabove quoted, referring to an erection schedule to be supplied in advance by Purvis and accepted by Associated. The representatives of the parties met, on February 27, and agreed on a schedule. Duecy, for Associated, on February 28 advised Purvis by telephone that a schedule had been agreed on, and signed and returned the draft contract to Purvis. On March 8 Purvis signed the contract and returned a signed copy to Associated. On March 23, Purvis sent to Associated a schedule which required performance by Associated earlier, as to the various items in the progress of the work, than was required by the February 27 schedule. Associated refused to agree to the proposed March 23 accelerated schedule, saying that it would accelerate as much as it could but would not bind itself to do so. Associated did, to a substantial extent, perform in advance of the February 27 schedule.

The work proceeded. Associated completed all its work in accordance with or in advance of the erection schedule agreed to on February 27. But Purvis, who had, pursuant to the subcontract, withheld agreed percentages of the progress payments periodically earned by Associated, refused, when the contract was completed, to pay Associated the withheld amount, which was $105,388.30.

In the final settlement of the prime contract between Purvis and the United States, the United States charged against Purvis liquidated damages, as stipulated in the prime contract, because of late completion of certain particular items of Purvis' contract, although the pavilion as a whole was completed on time. Purvis blames Associated for the late completion of the particular items as to which Purvis was charged liquidated damages by the Government, and that alleged fault on Associated's part is the reason Purvis did not pay Associated the balance otherwise admittedly due on its subcontract.

As we have said, Associated completed its work by the times set in the February 27 schedule. Purvis' claim that Associated was in default means, therefore, that Purvis claims that the February 27 schedule was not the measure of Associated's obligation under the contract. Purvis' contention is that Associated's obligation was to furnish its precast concrete panels in time so that they could be erected in time for Purvis to get the various items of its prime contract performed by the times set in that prime contract, and thus avoid any obligation on the part of Purvis to pay liquidated damages to the Government for late completion of individual items in the progress of the work.

As we understand Purvis' contention, it is that the parties, when they set up the February 27 schedule, implicitly meant that that was to be the schedule if, but only if, it was expeditious enough to enable Purvis to comply with his obligations to the United States under his prime contract. There was, however, no provision in Associated's subcontract that its provisions were the measure of Associated's obligations to Purvis only if

Purvis' obligations to the United States could be fulfilled under the schedule agreed to by Purvis and Associated. We do not see how a subcontractor could deal on the basis which Purvis contends for. It would mean that the subcontractor, involved in only a fraction of the work called for by the prime contractor, could be faulted because he could not speed up his performance to a pace impossible or unreasonably expensive for him, in order to make up for delays occurring through the fault or misfortune of other subcontractors, or of the prime contractor himself, over none of which the subcontractor had any control.

A case might perhaps be imagined in which a subcontractor, having studied the prime contract, as important subcontractors ordinarily do, might induce or allow an imprudent prime contractor to make a subcontract with him embodying a progress schedule which would make it impossible or unduly expensive for the prime contractor to meet his progress or completion schedule with the owner. This is not such a case. The February 27 schedule was discussed and agreed to by experienced representatives of three interests, Purvis, Associated, and the erection subcontractor. At the trial Purvis made no offer of proof of any such extraordinary situation as we have hypothesized above.

■ The District Court's conclusion that the February 27, 1961, schedule was intended to be, and was, the measure of the contractual obligation of Associated as to time of performance was supported by the evidence. Its conclusion that the provisions in Purvis' prime contract with the United States for administrative settlement of disputes between those parties had no application to Associated's subcontract with Purvis was likewise supported.

The judgment of the District Court is modified by what we have said herein about the strand and duct controversy and about the corbel repairs controversy, and, except as so modified, is affirmed.