KEVIN C. O'SULLIVAN v. WILLIAM S. BERGENTY
(13851)

SHEA, GLASS, COVELLO, HULL and SANTANIELLO, Js.

---

Argued January 30—decision released April 24, 1990

*William J. Sweeney, Jr.,* for the appellant (defendant).

*T. J. Donohue, Jr.,* with whom was *Charles M. Rice, Jr.,* for the appellee (plaintiff).

GLASS, J. The plaintiff, Kevin C. O'Sullivan, brought this action against the defendant, William S. Bergenty, in two counts, the first seeking specific performance of a contract to convey real estate, and the second seeking money damages. The trial court rendered judgment

of specific performance in favor of the plaintiff, but denied money damages. We find no error.

The facts found by the trial court, as reflected in the record, are essentially as follows. The real estate involved in this action is commercial property that is owned by Bergenty, and located at 433 Farmington Avenue in Plainville. O'Sullivan had leased the property from Bergenty for approximately eight years, and during that time O'Sullivan had owned and operated several automobile sales businesses on the property. The rental payments for the property ranged from $1000 to $1300 per month.

Throughout the course of the eight year landlord-tenant relationship, there had been continuous negotiations between the parties for the purchase of the property by O'Sullivan. In the spring or summer of 1984, the negotiations resulted in a proposed draft agreement which, on December 20, 1984, became a signed and witnessed buy-sell agreement. Neither O'Sullivan nor Bergenty, nor any witness to the agreement, denied the execution of the written agreement. The written agreement consisted of two parts, a written contract[1] and

---

[1] The written contract is as follows:

"BUY-SELL AGREEMENT

THIS AGREEMENT, made and concluded in duplicate this 20th day of ~~August~~ Dec. 1984, by and between KEVIN O'SULLIVAN, of the Town of Southington, County of Hartford and State of Connecticut (hereinafter referred to as the 'buyer'), and WILLIAM S. BERGENTY, of the Town of Plainville, County of Hartford and State of Connecticut (hereinafter referred to as the 'seller'),

WITNESSETH

1. That the buyer agrees to buy and the seller agrees to sell all of that certain piece or parcel of land, comprised of three (3) contiguous lots, situated on the westerly side of Farmington Avenue (Conn. Rte. 10), Town of Plainville, County of Hartford and State of Connecticut, more particularly described in Schedule 'A' annexed hereto and made a part hereof, for a total price of One Hundred and Seventy-Five Thousand Dollars and 00/100 ($175,000.00), payable as follows:

~~(a) By payment to the seller or seller's attorney of the sum of $500.00 upon the execution of this agreement.~~

a promissory note.[2] The written contract provided, in part, that payment was to be made: "By tendering seller at time of closing a properly executed purchase money mortgage in the principal amount of $175,000.00, payable over of (sic) 180 consecutive months commencing 30 days after closing in equal monthly installments of $2,100.30 each until said mortgage note is fully paid. Said prin-

(b) By paying seller, at time of closing, the further sum of $9,500.00 in cash or by certified or bank check.

(c) By tendering seller at time of closing a properly executed purchase money mortgage in the principal amount of $165,000.00 $175,000.00, payable over of [sic] 180 consecutive months commencing March 1, 1985 30 days after closing in equal monthly installments of $1981.65 $2100.30 each until said mortgage note is fully paid. Said principal amount shall bear interest at the rate of 12% per annum. The A.P.R. may vary at option of Buyer.

2. Adjustment of any taxes, interest, fuel, utilities and the like, if applicable, shall be made in accordance with the custom in the town in which the property is located.

3. Conveyance shall be by Warranty Deed free and clear of all exceptions and encumbrances except as hereinafter stated. Occupancy shall be granted at closing of transfer of title. Risk of loss or damage shall remain with the seller until closing.

4. Both parties expressly represent and warrant that no real estate broker's commission is or will be due or payable as a consequence of this agreement or at closing, and that no real estate broker is or has been the procuring cause of this agreement.

5. Closing of transfer of title and payment of the adjusted balance of the purchase price shall take place at the offices of Koskoff, McMahon & Condon, 144 West Main Street, Plainville, Connecticut, on or before the 10th day of January, 1986, or at such place as shall be mutually agreeable to the parties.

THIS AGREEMENT shall be binding upon the heirs, executors, administrators, personal representatives or assigns of the parties hereto.

In the presence of:

/s/ _____ (L.S.)
KEVIN O'SULLIVAN, BUYER

/s/ _____ (L.S.)
WILLIAM S. BERGENTY, SELLER

"

[2] The promissory note is as follows:

"$25,000                                    December 20, 1984
I, KEVIN C. O'SULLIVAN, of the Town of Southington, County of Hartford and State of Connecticut promise to pay WILLIAM [BERGENTY],

cipal amount shall bear interest at the rate of 12% per annum. The A.P.R. may vary at option of Buyer." The promissory note, which was for $25,000, was executed by O'Sullivan on December 20, 1984, and was made payable to Bergenty. It was tied to the agreement by providing that it "shall be paid in full on or before the date of closing for property described in the Buy-Sell Agreement dated December 20, 1984 between said KEVIN C. O'SULLIVAN and WILLIAM [BERGENTY]." The date set in the contract for the closing or transfer of title was January 10, 1986, which was approximately thirteen months after the date of execution of the agreement. The reason for the delay was to accommodate Bergenty for income tax purposes. O'Sullivan and Bergenty further testified that the two documents taken together comprised the entire agreement, that the agreement had been understood by them, that it had been properly executed, and that it was fair when made. Bergenty also testified that it was his understanding that a condition precedent to the completion of the transaction was for O'Sullivan to continue to pay monthly rent up to the date of the closing. The trial court found that, in reliance on the agreement, O'Sullivan continued his tenancy on the property, made monthly rental payments, and main-

---

of the Town of Plainville, County of Hartford and State of Connecticut the total sum of TWENTY-FIVE THOUSAND and 00/100 ($25,000) DOLLARS. Said amount shall be paid in full on or before the date of closing for property described in the Buy-Sell Agreement dated December 20, 1984 between said KEVIN C. O'SULLIVAN and WILLIAM [BERGENTY].

/s/
KEVIN C. O'SULLIVAN

WITNESSES:

/s/
FRED DENOTE

Sworn to and subscribed before me at Plainville, Connecticut this, the 20th day of December 1984.

/s/
THERESE O'SULLIVAN
NOTARY PUBLIC"

tained and improved the property with renovations, including a roof repair and a change in the door opening to the garage. In further reliance on the agreement, on June 10, 1985, O'Sullivan entered into a five year sublease of the premises in connection with a buy-sell agreement for a portion of the property with a sublessee. Bergenty was aware of the sublease, and at the time of the trial, the sublessee continued to occupy a substantial portion of the premises. In sum, the trial court found that "[a]fter the execution of the contract and his signing of the $25,000.00 promissory note, [plaintiff]—O'Sullivan was clearly acting in reliance upon the expectation that the agreement would be consummated in January of 1986."

The trial court found further that, at trial, Bergenty confirmed his belief that he had been obligated to proceed with the conveyance at all times up to and including January 10, 1986. O'Sullivan testified that several times prior to January 10, 1986, and twice between January 10 and January 20, 1986, he called Bergenty to request a closing on the property. At trial, however, Bergenty did not recall these telephone calls. Specifically, Bergenty and his attorney testified that neither one had done anything in furtherance of any closing prior to February, 1986. O'Sullivan additionally testified that he had engaged in conversations with Bergenty "half a dozen times" during December, 1985, and at no time did Bergenty lead him to believe that he would not sell him the property. Both O'Sullivan and Bergenty testified, however, that on January 20, 1986, O'Sullivan called Bergenty requesting a closing of the transaction. Bergenty, in confirming the call, admitted at trial, that he renounced the contract at that time, stating: "We have no deal." Bergenty testified that the reason for his election not to close at that time was that O'Sullivan had missed the January 10, 1986 closing date.

At trial, Bergenty asserted that O'Sullivan's claims for specific performance of the contract and for money damages were unfounded because: (1) the contract was not enforceable because it was not in accordance with the requirements of the statute of frauds; (2) the contract term "A.P.R." was not defined with reasonable certainty and therefore there was no enforceable agreement; (3) O'Sullivan was never ready, willing and able to perform in accordance with the terms of the contract; and (4) O'Sullivan had failed to establish the applicability of the doctrine of part performance. The trial court found, however, that Bergenty's conduct made it impossible for O'Sullivan to establish a closing date, and on the basis of the facts found, the trial court concluded "that the plaintiff-O'Sullivan ha[d] established the applicability of the doctrines of equitable estoppel and of detrimental reliance." As a result, the trial court held that Bergenty was estopped from asserting his statute of frauds defense. In addition, the trial court held that O'Sullivan had met his burden of proving that he was ready, willing and able at all times to purchase the property, and thus was entitled to specific performance. In view of these conclusions, the trial court held that it was unnecessary for it to consider Bergenty's arguments concerning the "A.P.R." clause and part performance. Consequently, a judgment was rendered in favor of O'Sullivan and specific performance of the contract was ordered. This appeal then followed.

On appeal, Bergenty claims that the trial court erred in concluding: (1) that O'Sullivan had established the applicability of the doctrines of equitable estoppel and detrimental reliance; (2) that an enforceable agreement existed between the parties; and (3) that O'Sullivan was ready, willing and able to close, and thus had established his right to specific performance.

## I

The primary issue in this case is the claim of Bergenty that the trial court erred in its determination that O'Sullivan had established the applicability of the doctrines of equitable estoppel and detrimental reliance. In considering the law of estoppel in Connecticut, we have stated: " 'Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. *Bozzi* v. *Bozzi,* 177 Conn. 232, 242, 413 A.2d 834 (1979); *Dupuis* v. *Submarine Base Credit Union, Inc.,* [170 Conn. 344, 353, 365 A.2d 1093 (1976)]; *Pet Car Products, Inc.* v. *Barnett,* 150 Conn. 42, 53–54, 184 A.2d 797 (1962).' *Zoning Commission* v. *Lescynski,* [188 Conn. 724, 731, 453 A.2d 1144 (1982)]." *Kimberly-Clark Corporation* v. *Dubno,* 204 Conn. 137, 148, 527 A.2d 679 (1987).

Bergenty argues that the trial court failed to apply the two-prong test stated in *Kimberly-Clark Corporation* in determining the application of estoppel and detrimental reliance. The determination of the trial court, however, was based on its finding of fact, and we have stated: "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court." *Pan-*

*dolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

Applying these principles to the present case, we note that the trial court found that "Bergenty at trial testified that on December 20, 1984, he knew that he had made the deal for the 2 pieces of property at 433 Farmington Avenue for $175,000.00 and $25,000.00 with performance on or before January 10, 1986. The additional sum of $25,000.00 to be paid at closing had been structured to help Bergenty tax-wise, and with his knowledge. He testified that he had known the deal and had signed it without coercion." Relying on the "deal," Bergenty testified that it was his understanding that O'Sullivan was to continue to lease the property until the title to the property was transferred, and the trial court found that O'Sullivan, in reliance on the agreement or "deal" referred to by Bergenty, did continue to lease the property and pay the monthly rental payments. In addition, O'Sullivan maintained and improved the property with renovations, including a roof repair and a change in the door opening to the garage. He also entered into a sublease of a portion of the premises for a period of five years with the knowledge of Bergenty.

On the basis of the foregoing findings, it is reasonable, both legally and logically, for this court to conclude, as did the trial court, that "[e]ach such act of proven reliance upon the agreement was in addition to the execution and delivery of a valid promissory note in the amount of $25,000.00, which amount was to be paid by O'Sullivan to Bergenty at closing. After the execution of the contract and his signing of the $25,000.00 promissory note, [plaintiff]-O'Sullivan was clearly acting in reliance upon the expectation that the agreement would be consummated in January of 1986." Prior to the January 20, 1986 telephone conversation when Bergenty told O'Sullivan, "We have no deal," there is no evidence that Bergenty did anything to

induce O'Sullivan to believe that their agreement would not be honored. The trial court recognized Bergenty's commitment, stating: "Bergenty, at trial, clearly confirmed his belief that he had been obligated to proceed with the conveyance at all times up to and including January 10, 1986." The trial court's findings indicate that not only did Bergenty believe that he had a "deal" and was obligated to convey the property, but that his action as well as his inaction induced O'Sullivan to rely and to act as if the parties' contract would be performed.

In addition, Bergenty argues that the trial court failed to apply the proper burden of proof standard regarding equitable estoppel. In *Kimberly-Clark Corporation* v. *Dubno,* supra, 148, we stated: " ' "[I]t is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." *Pet Car Products, Inc.* v. *Barnett,* [supra, 54]; *Linahan* v. *Linahan,* 131 Conn. 307, 327, 39 A.2d 895 [1944].' *Reinke* v. *Greenwich Hospital Assn.,* 175 Conn. 24, 28–29, 392 A.2d 966 (1978)." Although the trial court did not make a specific finding of diligence, the record fully supports the trial court's conclusion that the doctrine of equitable estoppel had been established by O'Sullivan. In particular, the trial court found that O'Sullivan testified that several times prior to January 10, 1986, and twice between January 10 and January 20, 1986, he had called Bergenty to request a closing. Although Bergenty, at trial, testified that he did not recall such conversations, he did confirm the January 20, 1986 call when he renounced the contract and told O'Sullivan: "We have no deal." O'Sullivan also testified that during December, 1985, he had had "half a dozen" conversations with Bergenty and that Bergenty had never led him to believe that he would not perform the contract. Since O'Sullivan, prior to Janu-

ary 20, 1986, had not been led to believe that Bergenty would not perform the contract, we can discern no reason for O'Sullivan to be any more diligent in his contacts with Bergenty than the record reflects.

In summary, the conclusions of the trial court are supported by its findings of fact stated in its memorandum of decision, and the record indicates that the findings of fact stated in the memorandum of decision are supported by the evidence. See *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra. Thus, given the facts found by the trial court, we are unable to conclude that the trial court was clearly erroneous in its conclusion that O'Sullivan had established the applicability of the doctrines of equitable estoppel and detrimental reliance.

## II

Because the trial court determined the equitable estoppel and detrimental reliance issues adversely to Bergenty, it concluded that it was "unnecessary to consider [Bergenty's] arguments concerning the 'APR' clause and part performance." Bergenty argues, however, that "since the term A.P.R. is not defined in the contract and since the parties cannot determine what it means the unescapable conclusion must be drawn that an essential term is not defined with reasonable certainty and there is no enforceable agreement." Bergenty states further that "[w]hat the parties intended by this part of the agreement is the crux of the issue in finding that an enforceable contract existed between the parties. Although the trial court felt that it need not deal with the A.P.R. issue because of its finding of equitable estoppel, the effect of its ruling was to put the A.P.R. right back into the controversy because it is a part of the contract that the trial court found enforceable."

This is a meritless issue. "An agreement need not spell out all details of the bargain in order to be enforce-

able. Even if the parties have left some terms of their agreement indefinite, a court may enforce the agreement . . . if those terms are not material to the bargain, see, e.g., *United States* v. *City of New York,* 131 F.2d 909, 915 (2d Cir. 1942), cert. denied, 318 U.S. 781, 63 S. Ct. 858, 87 L. Ed. 1149 (1943)." *United States* v. *Bedford Associates,* 657 F.2d 1300, 1310 (2d Cir. 1981), cert. denied, 456 U.S. 914, 102 S. Ct. 1767, 72 L. Ed. 2d 173 (1982). In addition, the maxim ut res magis valeat quam pereat[3] mandates that writings should be interpreted and applied so that they have effect rather than be destroyed. See *Purvis* v. *United States,* 344 F.2d 867, 870 (9th Cir. 1965); *Mozzochi* v. *Luchs,* 35 Conn. Sup. 19, 23, 391 A.2d 738 (1977). In the present case, the "A.P.R." clause reads: "The A.P.R. may vary at *option of Buyer.*" (Emphasis added.) Thus, what the A.P.R. is or may be, may or may not be a defense if O'Sullivan ever elects to try to take advantage of it. The record is devoid of any evidence of O'Sullivan's exercising or attempting to exercise his option. Thus, if there is any uncertainty about "A.P.R.," the uncertainty is immaterial. In sum, just as the trial court concluded that it was unnecessary to decide the A.P.R. issue, we also decline to speculate about its meaning or its consequences since there is no evidence that O'Sullivan has elected to exercise his option in conjunction with this action for specific performance.

## III

Finally, Bergenty argues that the trial court erred in ruling that O'Sullivan was ready, willing and able to purchase the property, and thus entitled to specific performance. We are not persuaded. In particular, Bergenty asserts that the trial court's ruling was contrary

---

[3] That the thing may rather have effect than be destroyed.

to this court's decision in *Frumento* v. *Mezzanotte,* 192 Conn. 606, 473 A.2d 1193 (1984). In *Frumento,* we noted: "It has been stated that when a purchaser of land is left to depend upon a purchase price loan from a third party who is in no way bound to furnish such funds, the purchaser cannot be considered to be able to perform so as to be entitled to specific performance." Id., 617. As a result, we held in *Frumento* that the purchaser's testimony, that he could have borrowed money from his parents to purchase the property in question, was not sufficient to establish that he was ready, willing and able, in light of the fact that no evidence was offered concerning his parents' ability to make such a loan to him. Id., 615 n.13, 618.

In the present case, however, evidence was offered concerning O'Sullivan's ability to access sufficient money to effectuate the purchase. Specifically, O'Sullivan needed to show that he was capable of furnishing the funds to pay the $25,000 promissory note that was then due to Bergenty. The contract did not require O'Sullivan to tender any other payments at the time of the closing. At trial, O'Sullivan presented the testimony of his commercial banker, John S. Driscoll, who was a vice-president of the Bristol Savings Bank. Driscoll testified that, in December, 1985, O'Sullivan had a $150,000 open line of credit with his bank, and that if O'Sullivan had asked for a loan of $25,000, his request would have been approved the next day. In addition, when asked on cross-examination if O'Sullivan would have had any problem getting a loan for $25,000, even if his $150,000 open line of credit were used up, Driscoll responded: "Probably not."

Thus, given that the present case is distinguishable from *Frumento,* and given that "[t]he granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all the facts and circumstances when

viewed in light of the settled principles of equity," we hold that the trial court properly found O'Sullivan to be ready, willing and able to purchase the property in question, and, therefore, entitled to specific performance. *Frumento* v. *Mezzanotte, supra,* 615.

There is no error.

In this opinion COVELLO and SANTANIELLO, Js., concurred.

SHEA, J., with whom HULL, J., joins, dissenting. I disagree with the conclusion reached in Part II of the majority opinion that we may affirm the judgment without resolving the significance of the provision of the land sale agreement, which follows the stipulation for interest of 12 percent per annum on the purchase money mortgage, declaring: "The A.P.R. may vary at option of Buyer." At trial the plaintiff testified that, when the defendant had requested a change in the closing date from January 10, 1985, as originally proposed, to January 10, 1986, he had also agreed that the mortgage interest rate "may not be twelve percent; it may be eleven percent or ten percent, whatever the bank going rates are at that time." He also testified that both he and the defendant had made "an oral agreement that we had to keep [the interest rate] at one or one and a half above prime" and that "[i]f interest rates went down, then my interest, fixed rate, would go down also."

The provision concerning the option to vary the A.P.R. was added to the clause relating to the purchase money mortgage at the time the contract of sale was executed. The plaintiff's attorney, who prepared the contract of sale but was not present when the parties, without counsel, inserted the A.P.R. provision and signed it, testified that he did not know "what A.P.R. was" and that "it could be subject to a variety of

interpretations, *annual percentage rate.*" (Emphasis added.) The trial court made no finding as to the meaning of this provision.

The majority regards the ambiguity in the agreement created by the A.P.R. provision as a "meritless issue," relying upon the principle that indefiniteness in some terms of an agreement is not fatal " 'if those terms are not material to the bargain,' " quoting *United States* v. *Bedford Associates,* 657 F.2d 1300, 1310 (2d Cir. 1981), cert. denied, 456 U.S. 914, 102 S. Ct. 1767, 72 L. Ed. 2d 173 (1982). This court for many years has held, however, that the terms of a purchase money mortgage in a land sale contract are essential to its validity when specific performance is sought, as in this case. *Montanaro* v. *Pandolfini,* 148 Conn. 153, 157–58, 168 A.2d 550 (1961) (purchase money mortgage provision specifying amount, duration and rate of interest, but failing to indicate amount of monthly payment held too "ambiguous, indefinite and uncertain" to satisfy statute of frauds); *Sullivan* v. *Ladden,* 101 Conn. 166, 168, 125 A. 250 (1924) ("We have uniformly held that where a written agreement for the sale of land provides that a portion of the purchase price shall be secured by a mortgage, the agreement must fix the time the mortgage is to run, in order to satisfy the requirements of the statute of frauds."); *Gendelman* v. *Mongillo,* 96 Conn. 541, 546, 114 A.2d 914 (1921) (" '[I]f the memorandum shows that the sale was upon credit, the terms of such credit must be stated.' " quoting *Ebert* v. *Cullen,* 165 Mich. 75, 130 N.W. 185 [1911]). The requirement that the financial terms of a purchase money mortgage be fully set forth in a land sale agreement is generally regarded as a prerequisite for compliance with the statute of frauds. 1 Restatement (Second), Contracts § 131, comment g, illustration 16.

The majority also maintains that it is unnecessary to resolve the significance of the A.P.R. provision

because it merely gives the plaintiff an option that he may never elect to exercise. The issue of whether a written contract is too indefinite to satisfy the statute of frauds, however, must be decided on the basis of its provisions at the time of execution. If the A.P.R. provision rendered the agreement of the parties too indefinite for the purpose of fashioning a decree of specific performance on December 20, 1984, when they signed it, nothing either of them later could do unilaterally would remedy that defect. The plaintiff cannot retrospectively restore enforceability to this contract, if it was not there originally, by electing not to exercise the right not to be bound to the 12 percent interest stipulation simply because it may now be advantageous to do so. If the effect of exercising his option for a lower interest rate pursuant to the A.P.R. provision would render the contract unenforceable for indefiniteness, the plaintiff would have under this contract a right to perform or not to perform as he chooses. His promise to purchase the property would then have been illusory and could not have constituted consideration for the defendant's promise to sell. "Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor." 1 Restatement (Second), Contracts § 76, comment d. "Where the apparent assurance of performance is illusory, it is not consideration for a return promise." Id., § 77, comment a.

Without a finding as to the significance of the A.P.R. provision, particularly whether there is some limitation on the broad option it appears to give the plaintiff to select the interest rate on the purchase money mortgage, this essential term of the contract is too vague for enforcement. I would remand the case for further proceedings to resolve this issue.

Accordingly, I dissent.