Filed 11/28/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TIFFANY BUILDERS, LLC, et al., | B314861 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. EC068240 |
| v. | |
| DAVID DELRAHIM et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ralph C. Hofer, Judge. Affirmed in part, reversed in part, and remanded.

MK Smith, Jason K. Smith and Mark T. Kearney for Plaintiff and Appellant.

Bleau Fox, Martin Fox and Lana Lukyanov for Defendants and Respondents.

_____

At a coffee shop in Calabasas, David Delrahim made Edwart Der Rostamian a business proposal. Rostamian got his notebook, asked a server for a pen, and worked with Delrahim to compose two pages of text. When they were done, each man signed the paper. Rostamian later sued Delrahim on contract claims. The trial court granted Delrahim's motion for summary judgment, ruling the Calabasas writing was too indefinite to be a contract. We reverse that point but affirm the ruling against Rostamian's claims for tortious interference with a contract.

I

According to Rostamian, the Calabasas discussion concerned the purchase of 13 gas stations. He argues that, if considered in the context of his and Delrahim's ongoing negotiations, their signed writing was a binding contract.

We set out the context Rostamian gave the trial court. This account is one-sided because Delrahim chose not to offer declarations giving his version of the facts. This one-sided account was the record in the trial court.

The gas stations in question belonged to seller Ibrihim Mekhail, operating through a family trust. Mekhail was not at the coffee shop and is not a party to this case.

Mekhail was selling the 13 stations as a block. He was offering nine of the 13 with their attached land and the other four without the land: only the businesses were for sale. The parties called the four the "dealer sites."

Rostamian had been seeking to complete a deal with Mekhail through Rostamian's company Tiffany Builders LLC, but the deal bogged down. Tiffany had signed a purchase agreement with Mekhail for the 13 stations. Rostamian assembled a group of other investors, including one Carol International, Inc., willing

to buy Mekhail's stations for about $12.8 million.  Rostamian opened an escrow to which Carol had contributed about $250,000, but the escrow did not close for various reasons.  Rostamian eventually would assign Tiffany's rights in the deal to Carol International, although it is not clear exactly when this happened.  In any event, Rostamian kept searching for a way to consummate the transaction and to profit from his efforts.

A mutual acquaintance introduced Rostamian to Delrahim, who expressed interest in the stations.  Delrahim owned a company named Blue Vista Partners.  Over an interval of some nine months, Rostamian and Delrahim met twice in Studio City and then continued to discuss, via email and text, ways to make a deal.  Then in November 2015, Delrahim said he had a proposal to discuss in person with Rostamian.  The two met at the Calabasas coffee shop.

Delrahim proposed Rostamian should back his company out of the pending escrow so Delrahim could buy the stations from Mekhail for $12.4 million, or less if Delrahim and Rostamian could negotiate a lower price.  Delrahim would pay Rostamian $500,000 to do this.  Delrahim also proposed Rostamian would own the four dealer sites.  Delrahim would charge Rostamian a monthly fee to run these dealer sites, and Rostamian would reap their profit.

Delrahim and Rostamian worked together to word their deal.  This two-page hand-written document is central to this appeal.  We call it the Writing.

We quote this Writing, with corrected spellings and capitalizations and with bracketed numbers for clarity:

"[1]  From $12,400,000, bring the value to X amount difference between $12.4 million and X amount will be allocated based on the following.

"[2]  $500,000 to Tiffany Builders to get out of the GlenOaks escrow.

"[3]  Balance will be charged against purchase of 4 dealer sites from 3rd party based on existing allocated price.  That is provided the X amount covers the entire value.

"[4]  4 stations will be run 100% by David Delrahim (buyer of the 13 stations) in behalf of Edward Rostamian for 24 months or sooner with $4,000 per month cost for the 4 stations."

"X Edwart Rostamian [handwritten signature]

"X David Delrahim [handwritten signature]"

Rostamian explained the Writing in his declaration.

Section [1] referred to the $12.4 million Delrahim was willing to pay for the 13 stations.  The men inserted the "X amount" because they thought they could negotiate the price to less than $12.4 million.  "We didn't know how much lower we could negotiate so we put X in there as a placeholder, but we would obviously be able to fill in the X with the actual contract price that would ultimately be signed between [Delrahim's company] Blue Vista Partners and Mekhail."

Section [2] meant Delrahim and Blue Vista would pay Rostamian and Tiffany $500,000 for backing out of the escrow so Delrahim could open his own escrow for the purchase of the stations.

Section [3] referred to the four dealer sites.  Rostamian and Tiffany would own them and would pay Delrahim and Blue Vista to operate them.  Rostamian would take the operating fee out of his profits from the stations.

4

Section [4] explicated section [3] by setting the operating fee at $4,000 per month, which was $1,000 for each station. Section [4] also established Delrahim would be listed on title as the owner until either Rostamian got listed as owner or they sold.

In short, Delrahim would take the lead in the stations deal in return for guaranteeing benefits for Rostamian. Delrahim would rescue Rostamian's foundering escrow for Delrahim's own benefit: Delrahim would buy the 13 stations at a price the two hoped they could negotiate down from the $12.4 million figure. Delrahim would own nine stations that were not dealer sites, and would gain a $4,000 a month fee for operating the four dealer sites. Delrahim would pay Rostamian $500,000 and would give Rostamian ownership of, and profits from, the dealer sites.

None of that happened. To Rostamian's dismay, Delrahim decided to deal directly with Mekhail and to cut Rostamian out of the picture. Delrahim bought the 13 stations for about $11 million. Rostamian got nothing.

Rostamian and Tiffany sued Delrahim and Blue Vista for breach of contract, specific performance, intentional and negligent interference with prospective economic advantage, and unfair business practices. Delrahim and Blue Vista moved for summary judgment. The trial judge issued a tentative ruling, heard argument, adopted the tentative ruling, but then recused himself. The case was assigned to a different judge, who set aside the earlier ruling and reset the summary judgment hearing. The parties filed new papers. Rostamian added his own declaration to the record before the court. Delrahim did not contribute a declaration from any percipient witness.

The trial court granted Delrahim's summary judgment motion. The court reasoned the Writing was too indefinite to be a

5

contract. The court considered the parol evidence from Rostamian's declaration but concluded this evidence failed to clarify the terms to a legally acceptable degree. The court ruled the most critical omission was who would own the 13 gas stations upon completion of the deal. Delrahim had argued Rostamian's declaration was a sham because it contradicted Rostamian's deposition testimony. The court took note of this argument and responded in the alternative. For two portions of the declaration, the court observed it *could* disregard portions of this declaration, but it elected *not* to do so. The court did disregard, however, one portion of the declaration. The court ruled that, "[t]o the extent Rostamian now testifies in his declaration definitively that he was to be the owner of any portion of the stations," the court would disregard this claim. In the alternative, even were it to consider all of Rostamian's declaration, the court ruled the contract was still too uncertain to enforce. The court also rejected Rostamian's other claims, as we shall explain.

Rostamian and Tiffany appeal the judgment against them.

## II

As supplemented by parol evidence, the Writing was definite enough to be an enforceable contract. The grant of summary judgment was error. Our review is independent. (*Harris v. Thomas Dee Engineering Co., Inc.* (2021) 68 Cal.App.5th 594, 604 (*Harris*).)

## A

Three streams of law converge to control this case.

### 1

The first rule concerns parol evidence, also called extrinsic evidence.

6

Chief Justice Traynor wrote the "test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37.)

Rostamian's declaration satisfied this test. It was relevant to prove a meaning to which the Writing was reasonably susceptible. The trial court did not rule to the contrary. It properly accepted Rostamian's explanation of the Writing.

Delrahim incorrectly argues that Rostamian's assertion that the contract is unambiguous estops him from arguing extrinsic evidence provides clarity. Briefing commonly, and acceptably, argues in the alternative. (E.g., *Kavruck v. Blue Cross of California* (2003) 108 Cal.App.4th 773, 782 [position that document unambiguous does not concede that, if ambiguity is found, it should be resolved against that party].)

2

The Writing, as explicated by Rostamian, was not too indefinite to enforce. It was not an illusory contract. When people pen their names to a document they have drafted together, the law accords their act a potent meaning. Delrahim and Rostamian signed their joint creation, thereby enacting a ritual signifying commitment: an exchange of promises. Courts strive to effectuate designs like that. Powerful authority proves it.

a

We construe instruments to make them effective rather than void. This rule is of cardinal importance. (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954.) The law leans

7

against destroying contracts because of uncertainty. If feasible, courts construe agreements to carry out the reasonable intention of the parties. (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 349.)

"An interpretation which gives effect is preferred to one which makes void." (Civ. Code, § 3541.) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (*Id.*, § 1643.) Courts will imply stipulations necessary to make a contract reasonable regarding matters to which the contract manifests no contrary intention. (*Id.*, § 1655.)

Indefiniteness as to an essential term may prevent the creation of an enforceable contract, but indefiniteness is a matter of degree. All agreements have some degree of indefiniteness. People must be held to their promises. If the parties have concluded a transaction in which it appears they intend to make a contract, courts should not frustrate their intention if it is possible to reach a just result, even though this requires a choice among conflicting meanings and the filling of gaps the parties have left. This rule comes nearer to attaining the purpose of the contracting parties than any other. (*Rivers v. Beadle* (1960) 183 Cal.App.2d 691, 695–696 [citing Corbin on Contracts, vol. 1, § 95, pp. 288–292].)

There are two reasons not to enforce an indefinite agreement. First, the agreement may be too indefinite for the court to administer—no remedy can be properly framed. Second, the indefiniteness of the agreement may show a lack of contractual intent. Courts should be slow to come to this conclusion. "Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and

8

that is more just to both than would be a refusal of enforcement." (1 Corbin on Contracts § 4.3 [fns. omitted].)

"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." (Rest. 2d of Contracts § 33 (2); see *Facebook, Inc. v. Pacific Northwest Software, Inc.* (9th Cir. 2011) 640 F.3d 1034, 1037–1038 [applying California law].)

"When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." (Rest.2d Contracts, § 204.)

b

Rostamian's explanation of the Writing made it definite enough for judicial enforcement. His version, which was binding on the trial court at the summary judgment stage, was a series of clear promises. First, he would withdraw from the escrow to give Delrahim pride of place, allowing Delrahim to profit from Rostamian's effort in finding and trying to exploit this business opportunity. Second, Rostamian would cooperate with Delrahim's effort to negotiate from Mekhail a price lower than $12.4 million. Third, Rostamian would pay Delrahim $4,000 a month to operate the four gas stations referred to as dealer sites. In return, Delrahim made three clear promises of his own: to pay Rostamian $500,000; to grant Rostamian ownership of, and profits from, the four dealer sites; and to operate the four dealer sites for Rostamian.

This exchange of promises was an enforceable contract.

The trial court ruled that four inexactitudes fouled the deal. None, however, sufficed to invalidate it.

9

First, the court objected that Rostamian did not identify the location of the gas stations at issue. These locations, however, were known to or easily discoverable by Delrahim and Rostamian: the 13 stations already were the subject of a deal in escrow for millions of dollars. A contract omitting details of the subject matter is enforceable when context or parol evidence can reveal the subject matter. (Cf. *Klein v. Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 99 ["When two parties bargain on an equal basis and the buyer is willing to buy a pig in a poke there is no policy of the law to prevent such a transaction."].)

Second, the court wrote it was not clear who would own the nine stations that were not dealer sites. But Rostamian's declaration showed Delrahim would be stepping into Rostamian's shoes as buyer. The reasonable implication was that Delrahim, as buyer, would be owner.

Third, the trial court saw an ambiguity as to whether the deal included just the individuals—Rostamian and Delrahim—or whether it also included their entities: Tiffany Builders LLC and Blue Vista Partners. So far as the record appears, however, Rostamian was sole owner of Tiffany and Delrahim was sole owner of Blue Vista. If ever some alter ego or similar question were to arise, standard motion practice and allied procedures would enable resolution of this eventuality. This hypothetical issue did not invalidate the parties' exchange of promises.

Fourth, the court balked at the parties' use of the X term. Recall Rostamian declared that he and Delrahim had inserted the X in the agreement as a placeholder to be replaced with the final contract price Delrahim's company would pay Mekhail.

Using X to denote a price-related term did not destroy this contract.

10

A contract need not specify price if price can be objectively determined. The absence of a price provision does not render an otherwise valid contract void. (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481–482 (*Lettuce Growers*).)

In the process of negotiating an agreement, price is a term frequently left indefinite and to be settled by future agreement. If the parties provide a practical method for determining this price, there is no indefiniteness that prevents the agreement from being an enforceable contract. (1 Corbin on Contracts (2023 supp.) § 4.3.)

"[A]lthough the necessity for definiteness may compel the court to find that the language used is too uncertain to be given any reasonable effect, when the parties' language and conduct evidences an intent to contract, and there is some reasonable means for giving an appropriate remedy, the court will strain to implement their intent." (1 Williston on Contracts (4th ed. 2023 supp.) § 4:30 [fns. omitted]; see also *Perdue v. Crocker Nat. Bank* (1985) 38 Cal.3d 913, 923–924 [bank signature card was a contract authorizing charges for processing checks drawn on accounts with insufficient funds and was not illusory, even though it did not specify the amount of the charges]; *J&A Mash & Barrel, LLC v. Superior Court of Fresno County* (2022) 74 Cal.App.5th 1, 38 [trial court held the contract was unenforceable because it was not possible to ascertain the purchase price, but this holding was "not legally tenable"]; *Sabatini v. Hensley* (1958) 161 Cal.App.2d 172, 175 ["The failure to specify the amount or a formula for determining the amount of the bonus does not render the agreement too indefinite for enforcement"]; cf. *Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 777 [the contract lacked a price term, but it was definite enough to

11

enforce:  it provided bases for determining the existence of a breach and for giving an appropriate remedy]; *Purvis v. United States ex rel. Associated Sand & Gravel Co.* (9th Cir. 1965) 344 F.2d 867, 870 [What should a court "do about an item left for future agreement, but upon which the parties never in the future agreed[?]  What the court should do is what is fair in the circumstances"].)

This use of X was acceptably certain.  As Rostamian explained, X was a placeholder to be replaced with the final contract price Delrahim's company would pay Mekhail.  The contract provided a formula for ascertaining the presently unknown sum X, which future events would determine exactly.  The X clause was no barrier to contract enforcement because the parties had provided a practical and objective method for determining X's value.  (See *Lettuce Growers*, *supra*, 45 Cal.2d at pp. 481–482.)

The Writing was definite enough to enforce contractually.

3

The trial court misapplied the doctrine against sham declarations.  In its statement of decision concerning contract uncertainty, the court disregarded part of Rostamian's declaration.  That declaration, however, was consistent with the relevant portion of Rostamian's deposition.  On this issue, Rostamian's declaration was not a sham.

The sham declaration doctrine comes into play when a plaintiff makes a clear and unequivocal admission in a deposition but, in a later declaration, contradicts that admission.  In this situation, the declaration's previously contradicted assertion alone cannot establish a triable issue of fact.  (*Harris*, *supra*, 68

12

Cal.App.5th at p. 603 [citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21.].)

This conclusion, however, follows only if there is no credible explanation for the supposed inconsistency. (See *Harris, supra,* 68 Cal.App.5th at p. 605.) The doctrine does not apply when a reasonable explanation resolves the supposed discrepancy. (*Id.* at p. 606.)

The doctrine against sham declarations requires courts to consider the directness of the asserted contradiction and the plausibility of harmonizing explanations. We look to the entire record when determining whether to disregard contradictory testimony. (*Ahn v. Kumho Tire U.S.A., Inc.* (2014) 223 Cal.App.4th 133, 144–146 [the question is not whether a declaration is inconsistent with earlier responses but whether in light of all of the evidence a reasonable trier could conclude the earlier responses were a mistake and declaration statements were credible].) The relevant evidence can include a party's explanation for contradictory testimony. (*Ibid.*)

The trial court identified a single supposed contradiction between Rostamian's deposition and declaration. We quote the trial court's ruling on this point.

"Rostamian testified that, 'Since I was under contract, he was going to buy it from me, or replace me, or become a partner [sic] or an investor.' [Supplemental Martin Decl., Ex. A, Rostamian Depo., p. 58]. [¶] To the extent Rostamian now testifies in his declaration definitively that he was to be the owner of any portion of the stations, the declaration can be disregarded. [Rostamian Decl., paras 24(c) (only the phrase, 'me and Tiffany Builders would own them,' and 24 (d), the sentence, 'I would be the owner.')]."

13

This excerpt was the trial court's sole relevant application of the doctrine against sham declarations. The court applied the doctrine in the alternative. The court ruled the contract was illusory even if it *did not* disregard any of the declaration. We have just concluded this ruling was error: the contract was not illusory. Alternatively, the court concluded it *could* disregard the assertion in Rostamian's declaration that Rostamian definitively would own a portion of the stations. It was error, however, to disregard Rostamian's declaration that "definitively he was to be the owner of any portion of the stations."

The supposed contradiction between Rostamian's deposition and declaration did not exist.

Opposing counsel deposed Rostamian and asked him this question: "Who was [Delrahim] going to buy [the 13 stations] from?" In context, and drawing reasonable inferences favorable to the party opposing summary judgment, Rostamian understood this question to ask this: "When you and Delrahim were negotiating about how to structure this deal, from whom was Delrahim going to buy the 13 gas stations?"

Rostamian answered: "Since I was under contract, he was going to buy it from me, or replace me, or become a partner or an investor."

Context informs the reasonable interpretation of Rostamian's answer. On the same transcript page, Rostamian explained Delrahim "was determined at $12.4 million to pay for everything." Rostamian answered later that he was "negotiating with [Delrahim] in many occasions, via e-mail, text, and three meetings. . . . [Delrahim] wanted to see me. So we met at Coffee Bean in Calabasas."

14

Rostamian's deposition answer was consistent with his declaration. Before Rostamian and Delrahim wrote and signed the Writing, their discussions were freewheeling and wide ranging. Rostamian was "under contract" and in escrow with Mekhail, so one possible form of the deal would be to complete the escrow and thus to make Rostamian the intermediate buyer, who then would sell to Delrahim, who would become the ultimate buyer. Another possibility was for Delrahim to "replace" Rostamian in the escrow, thus again making Delrahim the ultimate buyer. Or Delrahim could become Rostamian's partner, or he could become an investor in the deal. The two men were canvassing possibilities before they reached an agreement and drafted the Writing. In the portion of the declaration the trial court cited, Rostamian explained that the Writing set out Delrahim's promise to allow Rostamian to own the four dealer sites. Rostamian's deposition answer did not contradict Rostamian's declaration.

Similarly, there was no contradiction between Rostamian's declaration stating in one place "me and Tiffany Builders would own them" and later stating "I would be the owner." Tiffany Builders was Rostamian's corporation. Rostamian evidently did not distinguish between his biological self and his corporate self in this business setting.

Rostamian's declaration was internally consistent. Moreover, the sham declaration doctrine operates to attack a contradiction between an earlier deposition and a later declaration. Supposed inconsistencies within a single declaration are not within its purview.

* * * * *

In conclusion, we reverse the summary judgment ruling on the breach of contract claim because the contract was enforceable and not illusory.  This ruling mandates the same result for the specific performance and unfair competition claims, which the trial court evaluated under the same analysis.

III

We affirm the trial court's treatment of Rostamian's claims for tortious interference with prospective economic advantage.  Both negligent and intentional interference with prospective economic advantage require an economic relationship between the plaintiff and a third party, which here was Mekhail.  (*Golden Gate Land Holdings LLC v. Direct Action Everywhere* (2022) 81 Cal.App.5th 82, 91 [intentional interference]; *Venhaus v. Shultz* (2007) 155 Cal.App.4th 1072, 1077–1078 [negligent interference].)  But Rostamian's first separate statement listed as "undisputed" that, after Tiffany assigned its interest to Carol International, Tiffany no longer had an interest in the economic relationship with Mekhail.  In his later declaration and second separate statement, Rostamian tried to qualify his unambiguous concession, but the trial court rightly said no, which demolished these two claims.  Rostamian's arguments to the contrary are unavailing.  Indeed, Rostamian's reply brief omits all effort to respond to Delrahim's appellate presentation on this point.
///

## DISPOSITION

We affirm the order dismissing the tortious interference causes of action.  We reverse as to the breach of contract, specific performance, and unfair business practices causes of action.  We remand the case for further proceedings.  The parties shall bear their own costs on appeal.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.

17