[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTS
The defendant, a veterinarian, purchased the land and buildings at 530 East Putnam Avenue, Greenwich, Connecticut along with an existing veterinary practice known as Blue Cross Animal Hospital from Doctor John Robinson in 1979. Doctor Robinson took back a purchase money mortgage at the time of the sale of the land, the building and veterinarian business to the defendant, and currently holds a mortgage on the property.
In May, 1980, the defendant hired the plaintiff as a full time associate veterinarian. The plaintiff worked long hours and learned the defendant's veterinarian business and the routine operation and maintenance of the building and the land. In the fall of 1981, the plaintiff and the defendant began discussions concerning the plaintiff's purchase of the veterinarian business from the defendant. The negotiations continued at which time, both parties were represented by counsel. The purchase and sale agreement for the business and the lease were executed by both parties on April 30, 1982, (Plaintiff's Exhibits A B). The purchase and sale agreement for the business provides the plaintiff with an exclusive option to purchase the land and buildings at any time during the lease and sets forth the procedure to determine the purchase price. (Plaintiff's Exhibit A, paragraphs 4a and 4a(i)). In addition to the good will, client list and files, the plaintiff purchased the furnishings and equipment located in the premises. (Plaintiff's Exhibit A Schedule B).
It is clear to this court that Exhibits A and B have separate identity. Exhibit A contains the option and the lease in paragraph #29 refers to the option and incorporates it by reference and makes it part of the lease. The plaintiff took over the business as owner and the property and as lessee on or about April 1, 1982. The defendant lived in Fairfield, Connecticut where he continued to reside until 1986 when he relocated to Tampa, Florida, where he resided at the time of trial. After the defendant moved to Florida he came to Connecticut approximately twice per year to check on his CT Page 5012 leased property. It is clear to this court, that the parties had a disagreement concerning repairs, maintenance and structural repairs. Exhibits D, and E indicate communications by the plaintiff to the defendant concerning repairs. It is clear to this court that the plaintiff and the defendant often could not agree on what was maintenance and what was the defendant's responsibility. The plaintiff managed the building, and took it upon himself to do repairs and hire material men to do repairs without first advising the defendant. Many of the repairs were listed as structural under the lease, but the defendant was not aware that structural repairs were needed since the plaintiff unilaterally ordered the repairs. In addition, the plaintiff, without prior written consent and totally unknown to the defendant, made substantial alterations, additions and improvements to the property. Although there is a dispute as to whether these repairs needed municipal approval, it is clear that no enforcement action was done by the Town of Greenwich.
In August of 1988, the plaintiff sent a letter to the defendant which letter was written by John Denney (Plaintiff's Exhibit F). The letter evidenced a large number of maintenance items and non-structural repairs which needed attention. Thereafter, the defendant retained counsel to advise the plaintiff that a failure to adhere to the needed repairs as set forth on the plaintiff's own list within 30 days would be deemed a default in which event the option to purchase would be null and void. See Plaintiff's Exhibit G. This is the only credible evidence prior to the exercise of the option concerning a claim of default. It is clear that thereafter, there were inspections made and further discussions and communications between the parties. It is clear to this court, that there was an ongoing dispute between the parties right up to and including the March 1993 notice of exercise of the option.
The terms of the lease are specific as to how the lease may be terminated. Paragraph #17 lays out those terms. By no further action by the defendant after the letter of September 20, 1988, a reasonable inference may be drawn from all of the facts proven, that there was either full compliance or substantial compliance with the terms of that letter.
This is further confirmed by the fact that the defendant personally inspected the property three times in 1992, in February, June and November, and took photographs of said premises that depicted the conditions which then and there existed. CT Page 5013
The defendant has introduced Exhibits #1, and #2 which show photographs of the premises. Defendant's #1 is forty-two pictures and defendant's #2 is forty-three pictures. On the other side of the ledger is Plaintiff's Exhibit U which is the videotape which was observed by the court as well as C-1 through 7 and pictures R-1 through 10. The court is satisfied that by a fair preponderance of the evidence, there has been compliance with paragraph 5 of the lease, in that "the tenant shall keep the premises in good condition, and shall redecorate, paint and renovate as may be necessary to keep them in repair and good appearance."
It is clear to this court that the defendant had an obligation under the terms of the lease to provide the plaintiff with an opportunity to cure, if in fact, there were found to be defects.
The seventeenth paragraph of the lease is the default provision, and it provides as follows:
 In case of violation by the Tenant of any of the covenants, agreements and conditions of this lease, or of the rules and regulations now or hereafter to be reasonably established by the Landlord, and upon failure to discontinue such violation within ten days after notice thereof given to the Tenant, this lease shall thenceforth, at the option of the Landlord, become null and void, and the Landlord may re-enter without further notice or demand. The rent in such case shall become due, be apportioned and paid on and up to the day of such re-entry, and the Tenant shall be liable for all loss or damage resulting from such violation as aforesaid. No waiver by the Landlord of any violation or breach of condition, nor shall lapse of time after breach of condition by the Tenant before the Landlord shall exercise its option under this paragraph operate to defeat the right of the Landlord to declare this lease null and void and to re-enter upon the demised premises after the said breach or violation. The provisions herein shall not apply in the event of an emergency or an act of God.
The seventeenth paragraph requires: (1) a violation of the terms of the lease (covenants, agreements and conditions); (2) failure to discontinue the violation within 10 days after notice; and (3) the lease becoming null and void at the option of the CT Page 5014 landlord.
Therefore, there is a requirement of notice of the violation, no cure by the tenant, and then an affirmative cancellation of the lease by the landlord. This was not done during the course of the lease, and prior to the exercise of the option. Although it is clear from the record that both parties exchanged bills and documents concerning their own interpretation of the lease, they were unable to come to some kind of an agreement except in a few circumstances.
In January of 1993, the plaintiff, through his attorney, advised the defendant that he was exercising the option. This was reconfirmed in Exhibit I in February of 1993 and Exhibit J in March of 1993. The defendant responded pursuant to Exhibit L and in sum and substance in Exhibit L, stated that the plaintiff was currently in default under the lease due to a lack of proper maintenance and that the plaintiff, therefore, had waived his right to exercise the option, and that the option was null and void. The next contact between the parties appears to be this lawsuit.
The plaintiff in his complaint, asks in the first count for specific performance of the option. The second count, asks for reimbursement for structural repairs made.
The plaintiff expended a large sum of money to keep the premises, a building of approximately 40 years old, in "good condition" and "good appearance." See Plaintiff's Exhibits M, N, R, S and U. There was also testimony by the Canine Unit Inspector, that the premises were in good condition, as well as Peter Taylor, the kennel worker, Candice Denney, former animal technician and the plaintiff. In addition to the money spent on repairs, painting and redecorating, plaintiff had a capable staff employed at the animal hospital which performed numerous maintenance tasks. In fact, the plaintiff employed a larger staff then when the defendant owned the business. Some of the work done was redecorating the basement, new industrial flooring in the first floor hallway and examining and surgery rooms, upgraded air-conditioning unit, numerous additional lighting fixtures, new cages, redecorated reception area, new countertops, new moldings, new alarm system and repair and replacement of pipes in the basement. The court is satisfied that the plaintiff has established its burden of complying with the fifth paragraph of the lease.
STRUCTURAL REPAIRS
CT Page 5015
The plaintiff claims that he is entitled to monies advanced for structural repairs. He claims the amount is $34,748.65. Although the plaintiff's argument is that the course of dealings defines structural repairs and that in fact, a contribution made by the defendant for the roof, defines the terms, the court does not find that to be the situation in the instant case. It is clear that paragraph five provides:
 "The Landlord is responsible for structural repairs only, i.e., air-conditioning, boiler, wiring and utility replacements and plumbing, provided tenant keeps up maintenance."
The court finds that the language of the contract is clear and unambiguous. The contract accordingly, is to be given affect according to its terms; Sanitary Services Corporation v. GreenfieldVillage Association, Inc., 36 Conn. App. 395, 399 (1994). A court cannot torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings. Thus, the plaintiff's misunderstanding the term, "i.e.," or his belief that the document should have read "e.g." is immaterial. The unambiguous language here is, "i.e." The use of the term i.e. is an abbreviation for "id est", meaning that is or that is to say. See Black's Law Dictionary (6th Ed. 1990) pg. 746. Whereas the use of the term "e.g." is an abbreviation for exempli gratia, meaning for the sake of an example. See Black's Law Dictionary (6th Ed. 1990) pg. 515.
The abbreviation "i.e." is universally understood to mean that is. When "i.e." is used as in this case, the text following limits the preceding thought to the language used. Construed according to its ordinary meaning, the "i.e." language of paragraph five limited the landlord's responsibility to air-conditioning, boiler, wiring, utility replacements and plumbing.
Both the plaintiff and defendant testified and agreed that the defendant contributed money toward the cost of replacing the furnace in 1984, since the plaintiff wanted to upgrade and convert from forced hot air to electric heat. In addition, the defendant contributed $1,824.39 toward the cost of replacing an air-conditioning unit (Defendant's Exhibit #4). Although the plaintiff claims to have paid many of the expenses for air-conditioning, boiler, wiring, utility replacements and plumbing, the plaintiff CT Page 5016 testified that in most instances he went ahead and made repairs and incurred expenses and did not advise the defendant of the incurred expense. The defendant did not learn of many of the claimed expenses until after the lawsuit was commenced. Accordingly, the plaintiff has failed to sustain his burden of proof by a fair preponderance of the evidence that he was entitled to be reimbursed.
EXERCISE OF THE OPTION
Despite the plaintiff's first two attempts to give the defendant notice of the plaintiff's intention to exercise the purchase option under the contract, the plaintiff finally hired a sheriff personally to serve notice on the defendant. The defendant failed under paragraph #4a of the agreement to provide the plaintiff with a real estate contract. The pertinent sentence in paragraph #4a states that "the seller at his sole cost and expense, shall provide the buyer, with a real estate contract within 30 days after receipt of such written notice of intention to exercise the option." Defendant has failed not only to provide a real estate contract within a 30 day period, but has completely failed and refused to send a real estate contract to the plaintiff at all.
On only three occasions did plaintiff ever receive communication regarding the appearance and condition of the premises. On no occasion did the defendant himself ever send plaintiff a letter regarding the appearance and condition of the premises. The first was six years into the lease when plaintiff sent a letter dated August 29, 1988, to defendant about repairs. See Plaintiff's Exhibit F. A response was sent by the defendant through his attorney dated September 20, 1988, that was marked as Exhibit G.
The second occasion was in the fall of 1992 after informal negotiations between the parties as to a purchase price broke down and the third, and final occasion, was a few months later after the plaintiff had a sheriff serve the defendant with notice of intention to exercise the option. Defendant responded through his attorney by letter dated April 23, 1993, which is Exhibit L.
At trial, the defendant's claim was that the defendant was justified in not sending plaintiff a real estate contract because plaintiff did not keep the premises in good appearance and condition. The case cited by both sides was Brauer v. Freccia,159 Conn. 289 (1970). This case also involved a lease with an option CT Page 5017 to purchase. The lease in the Brauer case specifically provided in part:
 IT IS FURTHER MUTUALLY AGREED that if the Lessee shall have duly and punctually fulfilled all of the provisions, agreements, covenants and conditions of this lease, including the provisions of this paragraph hereinafter set forth. . .
 Id., 291 nl. In Brauer, it was undisputed at trial that the tenant was several months behind in rental payments. Both the trial court and Appellate Court in Brauer concluded that the payment of rent due under the lease was a condition precedent to the tenant's right to exercise the option to purchase and the tenant had failed to meet this condition precedent. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right or performance." Id., 293. InBrauer, the language contained in the option to purchase provision was "lucid and unambiguous" and clearly indicated that the tenant's duty to comply with the terms of the option was conditioned upon the tenant's punctual performance of the obligations under the lease. Id., 293-94.
In the contract of purchase Exhibit A and the lease Exhibit B in this case, there is no language indicating the plaintiff had to meet certain duties as a condition precedent to his receipt of a real estate contract to purchase the premises. There is no language in the lease or contract that would sustain the defendant's contention that the plaintiff's right to exercise the purchase option was conditioned upon certain terms being met. "Whether a provision in a contract is a condition the nonfulfillment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in light of all the surrounding circumstances when they executed the contract." Lach v. Cahill,138 Conn. 418, 421 (1951).
The defendant, in his brief, admits that the language in the option clause in Brauer, to the effect that the landlord is obligated under the option clause if the tenant shall have duly and punctually performed all of the provisions and conditions of the lease, is not present in this case. This court finds that there is a further substantial difference between Brauer and the instant case. In Brauer, the lease contained the sole evidence of the option. In this case, mere reference to the option is made in the lease. The option is a separate and independent agreement. It is CT Page 5018 clear to this court that as consideration for the purchase of the business, there was an option and a lease bargained for. It appears to this court that it is logical that the protection sought concerning the option was one that the parties mutually agreed should be contained in the lease, but the option agreement, Exhibit A, has its own standing. This court finds that there was no clear and unambiguous intent evidenced by the parties to make compliance with all of the terms of the lease a condition precedent. The court finds that the defendant is in breach for failing and refusing to forward to the plaintiff a real estate contract within 30 days of the plaintiff giving the defendant notice. In Brauer,
the plaintiff was behind on rent, and the defendant landlord served a notice to quit claiming non-payment prior to the exercise of the option. Here the defendant did no such thing until after the option was exercised.
The court further finds that the other alleged defaults made by the defendant fail because one is not in default of this lease under paragraph seventeen until all of the provisions are complied with, and the court finds that the defendant has not complied with the breach provision of paragraph seventeen. Accordingly, this court finds it unnecessary to address whether the failure to make a timely increased rental payment on April 1, 1994, was a breach of the terms of the lease. The court further finds it unnecessary to discuss the claimed violation by the defendant of improvements without prior written consent because paragraph seventeen was not complied with. The court finds it unnecessary to address whether a subtenant in the premises was a breach of the lease.
SPECIFIC PERFORMANCE
The court finds that the plaintiff is entitled to specific performance of his option to purchase. This court finds that the defendant has breached the agreement concerning the option to purchase the premises. When a plaintiff seeks specific performance, he is invoking the equitable powers vested in the trial court. "[A]n action for specific performance of a contract to sell real estate is an equitable action and is to be determined by equitable principles." Frumento v. Mezzanotte, 192 Conn. 606,615 (1984). The evidence introduced at trial together with the testimony of all the witnesses, supports the granting of the equitable relief requested by the plaintiff. "The granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light of the settled CT Page 5019 principles of equity." Frumento, supra, 615.
The plaintiff has established that he was and still is, ready, willing and able to purchase the property. The contract required the defendant to send plaintiff a real estate contract within 30 days after receipt of written notice of the plaintiff's intention to exercise the option. Defendant admitted receiving written notice on March 22, 1993. At that time, plaintiff was ready to receive a real estate contract from the defendant. He had funds in the approximate sum of $145,000.00 available to put down as a deposit and had sufficient funds at trial. See Plaintiff's Exhibits O and Q. Although it appears that both of the parties had selected their own appraisers, they had failed to comply with the option provision in the contract that provided that the parties' chosen appraisers select a third appraiser and such three appraisers shall establish the reasonable market value of the premises at the time the option is exercised. There is also provision in the agreement that since the plaintiff exercised his option after March 31, 1987, he was entitled to a 20% reduction in the purchase price. It was also clear that the option provided for 7 1/2% on the signing of the contract and 7 1/2% at the closing for a total down payment of 15% and that the balance would be in the form of a mortgage to be given at 12% annual interest.
Although the court finds the defendant in breach of the provisions under the option, the court orders nominal damages to the plaintiff. The court finds that the claimed measure of damages being the amount paid as rent from what is argued was the proposed closing date, which brings the claim to the approximate sum of $171,500.00 based on approximately $8,500.00 to $8,700.00 of rent per month. The plaintiff has not briefed the law of damages other than to state "[a]s a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place him in the same position he would have been in had the contract been properly performed." Levesquev. D M Builders Inc., 170 Conn. 177, 181 (1976). This court agrees with that statement of the law. The court finds however, that the award of nominal damages is appropriate since the plaintiff has failed to sustain his burden that the rental payments are the fair measure of damages. On a purchase of the premises, some of the plaintiff's money would have been used up. Since this court is unaware at this time of the amount of the purchase price, it is not clear how much would have been paid in cash and how much would have been financed and whether that sum in fact would be more or less than the amount presently being paid as rent. The damages CT Page 5020 are speculative. No case has been cited by the plaintiff to substantiate the claim for money damages as to the magnitude of the amount except the general statement of the law which the court finds unpersuasive. The court finds that the plaintiff has failed to establish by a fair preponderance of the evidence the amount of money damages it claims.
COUNTERCLAIM
The court also finds the issues against the defendant on the counterclaim for the $17,174.39 as set forth in number 3 on page 18 of the defendant's brief and referred to on pages 10 and 11. These payments were made voluntarily by the defendant at a time when the parties were disputing what were improvements, and what was maintenance. Certainly the defendant had the right at the time he made that payment of $10,000.00 for instance for the roof, if it in fact was made to protect his default under his purchase money mortgage with Doctor Robinson, to have taken affirmative action under the terms of the lease, particularly paragraph seventeen. He did not do so. Certainly under the doctrine of unclean hands, the defendant should not be entitled at this point to claim those monies, and the plaintiff should not be entitled to claim payments made which he claims are due under the terms of the lease. The court finds both of these parties come in with unclean hands on this issue. The doctrine of unclean hands is applied "not by way of punishment but on considerations that make for the advancement of right and justice." Pappas v. Pappas, 164 Conn. 242, 246
(1973). It is a "legal euphemism which expresses the principal that where a party comes into court for relief he must show his conduct has been fair, equitable and honest as to the particular controversy at issue." Collens v. New Canaan Water Co., 155 Conn. 477,492 (1967). Both of the parties chose to use the lease when it protected their interest and to disregard it when it did not further their interest. They cannot now, come into court seeking this court to unravel that which was done by them with full knowledge of their legal rights.
ORDERS
Accordingly, the court makes the following orders.
(1) The court finds that on the plaintiff's first count claiming specific performance of the option to purchase the plaintiff was entitled to receive a real estate contract from the defendant by April 21, 1993, that the closing was to take place CT Page 5021 within sixty days after the seller received such written notice of intention to exercise the option.
The court hereby orders that the defendant specifically perform the contract sued upon by the defendant by forwarding a real estate contract to the plaintiff by June 30, 1995. All of the other terms and provisions of the option in paragraph 4a and 4(a)(i) shall be complied with. The buyer and seller shall appoint their appraisers of their own choice and these two appraisers shall select a third appraiser. The value of the premises is to be $4,500.00. Accordingly, that amount is awarded as attorney's fees.
The court in rendering this decision has considered all the testimony, all the Exhibits, all other evidence, the arguments of counsel and the briefs of the parties.
KARAZIN, J.